06-3280-cr(L), 06-3396-cr(CON)
USA v. Eppolito

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2007

(Argued: October 18, 2007          Decided: September 17, 2008)

Docket Nos. 06-3280(L),06-3396(CON)

_____

UNITED STATES OF AMERICA,

Appellant,

- v. -

LOUIS EPPOLITO and STEPHEN CARACAPPA,

Defendants-Appellees.

_____

Before:  KEARSE, SACK, and HALL, Circuit Judges.

Appeals by the government from postverdict orders of the United States District Court for the Eastern District of New York, Jack B. Weinstein, Judge, dismissing indictment count that charged defendants with racketeering conspiracy, see 18 U.S.C. § 1962(d), as barred by statute of limitations, see id. § 3282(a).  See 436 F.Supp.2d 532 (2006).

Reversed.

MITRA HORMOZI, Assistant United States Attorney, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Barbara D. Underwood, Counsel to the United States Attorney, David C. James, Robert W. Henoch, Daniel Wenner, Assistant United States Attorneys, Brooklyn, New York, on the brief), for Appellant.

JOSEPH A. BONDY, New York, New York, for Defendant-Appellee Eppolito.

DANIEL NOBEL, New York, New York, for Defendant-Appellee Caracappa.

KEARSE, Circuit Judge:

The United States appeals from orders of the United States District Court for the Eastern District of New York, Jack B. Weinstein, Judge, entered following jury verdicts finding defendants Louis Eppolito and Stephen Caracappa guilty on all counts of a superseding indictment ("Indictment") that charged them with, inter alia, racketeering conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). The district court granted each defendant a judgment of acquittal on the RICO conspiracy count pursuant to Fed. R. Crim. P. 29, ruling that there was insufficient evidence of that conspiracy's existence within five years of the commencement of this prosecution, and hence that the prosecution of defendants on that count is barred by the statute of limitations, see 18 U.S.C. § 3282(a). The court also ruled that unless its dismissal of the RICO conspiracy count were overturned on appeal, defendants should have a new trial on the other counts--which charged both defendants with distribution of and conspiracy to distribute narcotics, and charged Eppolito with attempted money laundering--because the evidence on the RICO conspiracy count may have unfairly affected the jury's

- 2 -

consideration of those counts. On appeal, the government contends principally that the evidence was sufficient to support the jury's finding that the conspiracy continued to exist within five years of the commencement of this prosecution, and that, in any event, defendants' conspiracy to conceal their associations, criminal conduct, and ongoing goals continued into the limitations period. Finding merit in the government's first contention, we reverse the orders of the district court and remand for reinstatement of the jury's verdicts and the imposition of sentences.

## I.  BACKGROUND

Louis Eppolito (sometimes referred to in the trial testimony as "Lou" or "Louie") and Stephen Caracappa (sometimes referred to in the testimony as "Steve") are former police detectives who were employed by the New York City Police Department ("NYPD") until the early 1990s. The present prosecution was commenced on March 9, 2005; the Indictment alleged that Eppolito and Caracappa, along with others, were leaders of a racketeering enterprise whose principal purpose was to generate money for its participants by assisting and protecting members and associates of organized crime families (collectively the "Mafia"). It alleged that from approximately May 18, 1979, through March 9, 2005, Eppolito and Caracappa conspired to conduct the affairs of the enterprise through a pattern of racketeering activity that

included bribery, obstruction of justice, witness tampering, narcotics trafficking, money laundering, kidnaping, and murder.

The evidence at trial included the testimony of law enforcement agents, former members or associates of organized crime families in the New York City area with respect to events in the 1980s and 1990s, and a government informant who secretly tape-recorded his conversations with Eppolito, Caracappa, and others in Las Vegas in 2004-2005. The jury found that Eppolito and Caracappa had committed all of the racketeering acts alleged against them in the Indictment and found them guilty on all of the counts in which they were charged. As we are reviewing a Rule 29 judgment of acquittal, we describe the record in some detail, taking the evidence in the light most favorable to the government and in accordance with the jury's verdicts. We note also that Eppolito and Caracappa, while endorsing the district court's ruling that the evidence was insufficient to support the jury's finding that the RICO conspiracy continued to exist into the limitations period, have not challenged the sufficiency of the evidence on the RICO conspiracy count in any other respect.

A.  <u>Events in the New York Area</u>

At the times pertinent to the Indictment, the New York City area Mafia consisted of five Organized Crime Families:  the Bonanno, the Colombo, the Gambino, the Genovese, and the Lucchese. The government's key witness at trial was Burton Kaplan, a former associate of the Lucchese Crime Family who had been involved in,

- 4 -

*inter alia*, narcotics trafficking, sales of stolen goods and misbranded clothing, and attempts to negotiate stolen financial instruments. At the time of this trial, Kaplan had served roughly one-third of a 27-year sentence imposed on him for conspiracy to engage in narcotics trafficking. Pursuant to his cooperation agreement in connection with the present case, Kaplan had pleaded guilty to, *inter alia*, participating in the RICO conspiracy alleged in the present prosecution. At trial, Kaplan testified principally that Eppolito and Caracappa were a partnership that in 1986-1993 provided various services to him as an associate of organized crime and, through him as an intermediary, to his close friend Anthony Casso, a Lucchese Crime Family member who in the late 1980s became its underboss, *i.e.*, second in command.

In the early 1980s, Kaplan had been in prison with Frank ("Frankie") Santoro, Jr., who was loosely associated with the Gambino Crime Family. In late 1985 or early 1986, after both men had been released from prison, Santoro approached Kaplan and said that Santoro had a cousin who was a police detective, whom he identified as Eppolito, and that "Eppolito and his partner"--only later identified to Kaplan as Caracappa (Trial Transcript ("Tr.") 426-27)--would, in exchange for money, provide Kaplan with law enforcement information and other types of assistance. At that time, Eppolito was an NYPD detective in the 63rd Precinct in Brooklyn; Caracappa, likewise an NYPD detective, was a member of a task force whose members included local detectives and agents of the Federal Bureau of Investigation ("FBI"). While Eppolito

- 5 -

generally had access only to information in his precinct, Caracappa's position with the task force gave him access to a great deal of information about both local and federal matters. Kaplan testified that Santoro, in offering the services of Eppolito and Caracappa, said Eppolito could

> search around and find out if I had anything pending against me or if I was under any kind of surveillance and that . . . [Santoro's] cousin had a partner that had a prestigious job and between the two of them, they could help me and if I had any problems physically, they could help me.

(Tr. 515.)

> Frankie approached me and said that his cousin was a detective and that if I wanted his cousin [could] get me information and could help me if I ever have a problem and could probably help me on ongoing investigations.
>
> . . . .
>
> . . . He offered to get me information on any investigation that was going on and if I had a serious problem in the street, he offered to do murders for me.

(Tr. 426, 427; see also id. at 516 ("He said that if I had any kind of serious problem, that--that he himself, his cousin and his cousin's partner were capable of doing a murder.").)

Kaplan initially rejected Santoro's offer, explaining that he "didn't want to do business with any cops" because it "possibly could come back and haunt [him] if one of them would later on in life become an informant." (Tr. 427-28.) Santoro assured Kaplan "that [Santoro] had done things with them previously and that they were good stand-up guys and that he would have no fear of anything, doing anything with them." (Tr. 517.) The term "stand

up," in the vernacular of organized crime, means refusing to give information to law enforcement agents, even if that refusal means receiving punishment and going to jail. (Tr. 748; see also id. at 551-52 (conversely, to "go bad" means "become [an] informant[]").)

1. The Murder of Israel Greenwald

Notwithstanding his initial rejection of Santoro's offer of assistance from Eppolito and Caracappa, Kaplan soon had a change of heart. In early 1986, having learned that his participation in a scheme involving stolen Treasury bills was in danger of being exposed, Kaplan hired Santoro, Eppolito, and Caracappa to murder one of the other participants in the scheme, Israel Greenwald.

Santoro, Eppolito, and Caracappa carried out their mission by following Greenwald's car on a highway and turning on flashing lights on their car, thereby causing Greenwald to stop on the side of the road. They told Greenwald that he was a suspect in a hit-and-run and that they needed to take him to the police station for a lineup. They then drove Greenwald instead to the premises of an auto repair shop in Brooklyn, where Santoro shot and killed him. Kaplan paid Santoro $30,000 for the murder; Santoro kept $5,000, unbeknownst to Eppolito and Caracappa, and divided the remaining $25,000 among himself, Eppolito, and Caracappa.

## 2. The Murder of Jimmy Hydell

In mid-1986, there was an unsuccessful attempt on the life of Casso, who was then the acting underboss of the Lucchese Crime Family. The attack took place in the 63rd Precinct, to which Eppolito was assigned. Kaplan then for the first time revealed to Casso that Kaplan had a friend whose "cousin works in that precinct and that he's a good guy and that he could probably help us" to identify Casso's attackers. (Tr. 574.) Without disclosing to Casso either Santoro's identity or defendants' names, Kaplan told Casso that "[Santoro] and his cousin, [and] his cousin's partner" "had done something for [Kaplan] . . . and that [Casso and Kaplan] could trust them." (Id.) Casso asked Kaplan to see what the friend, the cousin, and the partner could find out.

Kaplan relayed the request to Santoro, who said he would speak to Eppolito. Santoro thereafter gave Kaplan a packet of information that had been collected by Eppolito and Caracappa. The packet contained, inter alia, crime scene reports listing Casso's attackers, including Gambino Crime Family associate Jimmy Hydell and Nicky Guido, and describing the cars that had been used, including the license plate numbers and the addresses of the registered owners.

When Santoro delivered the information packet, he declined Kaplan's offer of payment, saying that the information was "a gift from my cousin and his partner. This is just to show you the kind of things that they would do." (Tr. 575.) Santoro said, "my cousin and his partner won't take any money for

something where somebody close to us got hurt. We're not that kind of people." (Tr. 580-81.)

After Kaplan gave the information packet to Casso and described the methods that Santoro, Eppolito, and Caracappa had used with Greenwald, Casso had Kaplan offer Santoro, Eppolito, and Caracappa $35,000 to kidnap Hydell and turn him over to Casso. They accepted the offer. They were cautioned not to kill Hydell, as Casso wanted to extract from Hydell information as to who had ordered or approved the attempt on Casso's life.

In mid-October 1986, Santoro, Eppolito, and Caracappa kidnaped Hydell and put him into the trunk of a car that had been provided by Casso. Santoro drove the car to a Toys "R" Us parking lot in which he had agreed to meet Kaplan and gave Kaplan the car keys; Eppolito and Caracappa had followed Santoro to the parking lot and remained at the entrance in order to provide protection. Casso, who was standing in the parking lot, asked Kaplan who the men were at the entrance; Kaplan recognized them as Eppolito and Caracappa, although they had not been formally introduced to him. Kaplan responded that they were his friend's cousin and the cousin's partner; Casso instructed that everyone should leave. Kaplan gave Casso the keys to the car in whose trunk Hydell had been placed, and Kaplan, Santoro, Eppolito, and Caracappa departed.

Casso took Hydell to a meeting of high-ranking members of the Lucchese and Gambino Crime Families and questioned him as to who had ordered the attempt on Casso's life. Hydell named three

members of the Gambino Crime Family, including Edward Lino, see Part I.A.8. below. Casso thereafter killed Hydell. Having offered to pay $35,000 for the kidnaping of Hydell, Casso added a $5,000 bonus. Kaplan delivered the $40,000 to Santoro, who kept the bonus for himself and divided the remaining $35,000 among himself, Eppolito, and Caracappa.

3. The Murder of "Nicky Guido"

After Hydell's kidnaping and murder, Casso instructed Kaplan to ask Santoro for the address and a photograph of Nicky Guido, who was mentioned in the packet of information on the attempted assassination of Casso. Santoro, after consulting Eppolito, reported to Kaplan that Eppolito would provide the information for $4,000. Casso considered the request greedy, given that he had added an unsolicited $5,000 bonus for the Hydell kidnaping; he refused to pay for the information on Guido, stating that he would get it another way. On December 25, 1986, Casso caused the murder of a man called Nicky Guido, but it was not the Nicky Guido referred to in the information packet. Santoro and Eppolito told Kaplan that Casso would have gotten the "right" Nicky Guido if Casso had been willing to pay $4,000 for the information.

4. Eppolito and Caracappa Begin Dealing Directly With Kaplan and Are Put on Retainer

Although during the initial period of their association Kaplan had seen Eppolito and Caracappa on two or three occasions,

he had never been introduced to them, and he dealt with them only through Santoro. In September 1987, while in the company of someone Casso had targeted for assassination, Santoro was killed. Only then did Kaplan reveal to Casso that Santoro was the friend whose cousin was one of the police detectives who were providing them with information.

After Santoro's death, Eppolito sent Santoro's widow to one of Kaplan's stores to ask whether Kaplan would like to meet Eppolito directly. Thereafter, Eppolito and Kaplan met in the Santoro home, while Caracappa remained outside, watching the house from a car. Eppolito proposed that he and Caracappa would "give [Kaplan] everything that we get on every family, any bit of information we get about informants, about ongoing investigations, wiretaps, and imminent arrests" (Tr. 620) in exchange for a retainer of $4,000 per month. "[M]urder contracts" were to cost extra. (Tr. 621.)

Kaplan relayed Eppolito's offer to Casso, who accepted it on the condition that Eppolito and Caracappa "work exclusively for us," i.e., the Lucchese Crime Family, and not give any information to members of other crime families. (Tr. 625-26.) For the next several years, Eppolito and Caracappa gave confidential law enforcement information to Kaplan, who relayed it to Casso; and Casso, through Kaplan, paid Eppolito and Caracappa $4,000 per month.

When asked at trial what Casso did with the information received from Eppolito and Caracappa, Kaplan testified that

- 11 -

if it was information about somebody from a different family, then Casso would pass it to the different families. He'd pass some information to the Bonannos and he passed some information to the Genovese. If it was someone that had something to do with him and they were informants, Casso had them killed.

(Tr. 442; see also id. at 165, 665-66 (describing relay by Casso of such information to high-echelon members of the Colombo Crime Family).) Kaplan testified that Eppolito said he liked doing business with Kaplan and Casso "because when [Eppolito] gave us information people got taken care of that deserved it, and that in the past he gave information to other people and they never acted on it." (Tr. 657.)

Although Eppolito and Caracappa knew they were dealing, through Kaplan, with Casso, Kaplan never told Casso Eppolito's and Caracappa's names. Even in 1992, when Eppolito published an autobiography called Mafia Cop that contained photographs of himself and Caracappa, and Casso told Kaplan he recognized them as the men who had helped Santoro kidnap Hydell, Kaplan refused to confirm that the detectives on Casso's payroll were Eppolito and Caracappa.

After Santoro died, Kaplan initially communicated principally with Eppolito. The two had a falling-out, however, when Eppolito sought more money and insisted on meeting Casso, and Kaplan adamantly refused. Thereafter, Kaplan communicated principally with Caracappa.

Throughout, the methods used for communications between Kaplan and Eppolito and/or Caracappa were designed to avoid disclosure or suspicion of their association. Kaplan never used

- 12 -

his home telephone to contact Eppolito or Caracappa; he used pay phones or cell phones. He purchased cell phones sometimes in his own name, sometimes in the names of others; and at times he had other persons purchase cell phones for him. When calling each other on the telephone, Kaplan, Eppolito, and Caracappa did not use their own names but frequently used the code name "Marco." Kaplan's personal telephone book contained the real names of many members or associates of organized crime families; only Eppolito and Caracappa were given coded entries--the name "Marco."

Kaplan generally met Eppolito and/or Caracappa in private places, such as their homes late at night when no one was on the street, or at the homes of relatives; or at locations where it would be difficult to identify or overhear them, such as on the shoulder of a busy highway; or in out-of-the way places, such as a cemetery in Staten Island. Kaplan testified that "from the beginning of [his] relationship with Mr. Eppolito and Mr. Caracappa, . . . one of the goals of the relationship [was] to conceal the relationship." (Tr. 1144.)

5. The Murder of John "Otto" Heidel

Soon after Eppolito and Caracappa were placed on retainer, Casso asked Kaplan to have them find out whether Lucchese Crime Family associate John "Otto" Heidel was cooperating with the authorities. Eppolito enlisted the help of Caracappa and later reported to Kaplan that Heidel was, in fact, cooperating. Kaplan

gave the information to Casso; in October 1987, Casso had Heidel killed.

Thereafter, Eppolito gave Kaplan audio tapes that Eppolito said he had removed from Heidel's apartment while investigating the murder. He told Kaplan, "this will prove that I was right, that the guy was cooperating, and that he was taping people." (Tr. 651.) Kaplan gave the tapes to Casso, who subsequently informed Kaplan that the contents of the tapes confirmed that Heidel had been cooperating with the authorities by recording conversations.

6. The Murder of Anthony Dilapi

In the late 1980s, Lucchese Crime Family member Anthony Dilapi, who was on parole, was suspected of having become a government informant. And when summoned by Casso to account for gambling establishments that Dilapi controlled, Dilapi did not appear for the meeting but instead sold his establishments and left town. Casso asked Kaplan to have Eppolito and Caracappa try to locate Dilapi. Caracappa wrote to Dilapi's parole officer indicating that he needed to contact Dilapi as part of an ongoing police investigation, and he was ultimately able to give Kaplan an address for Dilapi in California. Kaplan relayed the information to Casso, who sent three men to kill Dilapi. Dilapi, however, recognized one of the men and escaped, moving to a new location.

At Casso's request, relayed by Kaplan, Caracappa then obtained and reported Dilapi's new address in Hollywood. In

February 1990, Casso had Dilapi killed in the garage of his new apartment building.

### 7. The Murder of Bruno Facciola

In August 1990, Eppolito, who had retired from NYPD in early 1990, reported to Kaplan that there were impending arrests in an investigation focusing on New York's jewelry district. As Bruno Facciola, a Lucchese Crime Family capo, was not to be indicted but would merely be named an unindicted coconspirator, Eppolito told Kaplan that Facciola was a government cooperator. Though Casso at that time was a fugitive, see Part I.A.11. below, Kaplan remained in communication with him and relayed Eppolito's information about Facciola. In August 1990, Casso had Facciola killed.

### 8. The Murder of Edward Lino

As discussed in Part I.A.2. above, Casso had interrogated his would-be assassin Jimmy Hydell and had been informed that one of the men who ordered the attempt on Casso's life was Edward ("Eddie") Lino. Beginning in 1987 or 1988, Casso sought to have Lino killed. Casso asked Kaplan to offer Eppolito and Caracappa $65,000 to kill Lino.

Eppolito and Caracappa accepted the contract, eventually carried it out, and were paid $70,000. Kaplan testified that he learned of their success in November 1990 when Eppolito told him,

I got good news. I said, what. He says, we got

Eddie Lino. I said, what do you mean you got him?
He says, we killed him.

(Tr. 723.) When Kaplan asked how they had done it, Eppolito indicated that they had begun with the same ploy used on Greenwald and Hydell--i.e., following Lino on a highway and using flashing lights to have him stop on the side of the road. After Eppolito spoke briefly to Lino, Caracappa "shot [Lino] a number of times. [Kaplan asked] how come Steve shot him? [Eppolito] said, Steve is a much better shot." (Id.)

A few days later, in payment for the Lino killing, Kaplan relayed to Eppolito a box containing $70,000 in $100 bills. (See Tr. 724-25.)

9. Kaplan's Marijuana Distribution Business

In the mid-1980s and again beginning in 1991, Kaplan was engaged in marijuana trafficking. During those periods, the least he distributed in a given year was between 500 and 1,000 pounds. In his best year, he distributed 12,000 or 13,000 pounds of marijuana (see Tr. 443), for which his personal profit was "[p]robably a couple of million dollars" (id. at 832).

Kaplan had several discussions with Eppolito and Caracappa about his marijuana business during those years.

> Both of them had asked me together and separately if I wanted them to help me in any way that they would-- they would follow my truck in a car or surveil my warehouses and see if I had any heat on me, and any[ ]way that they could help me, they were willing to do it.

> They said they don't want any money for it, it's just a friendship situation, and I told them I

- 16 -

> appreciate it but we're doing certain things together and this has nothing to do with that, and I don't want to involve them in that business.

(Tr. 783.) Kaplan said it was not frugality that led him to decline their offer; "they offered to do it for nothing, out of friendship." (Id.)

### 10. The Attempted Murder of Herman Tabak

In 1991, Kaplan was also involved in a scheme involving stolen checks, collaborating with some of his co-participants in the earlier stolen Treasury bill scheme, see Part I.A.1. above. When cash was not forthcoming from the stolen checks as expected, one of Kaplan's collaborators said he thought one of the other participants, Herman Tabak, might be cooperating with the authorities. Kaplan then solicited Eppolito and Caracappa to kill Tabak.

Kaplan testified that Eppolito, after consulting with Caracappa,

> came back to me and he told me that he would take care of it for me, and I told him good, go ahead and do it. And he says, I have one problem with this. He says, I don't have any place to put him. We don't have--we don't have a problem shooting him but of [sic] no place to put the body.
>
> And I said, come over to my warehouse in Staten Island and I had another warehouse a block away and I took Louie over there and showed him. There was a garage pull up door there and I said just bring the body to me and pull into this garage and I'll take care of it from that point.

(Tr. 753.)

- 17 -

However, the attempt to kill Tabak failed. When Eppolito and Caracappa accosted him, telling him he was under arrest, Tabak escaped into the street, screaming that they were trying to kill him. Eppolito and Caracappa quickly departed. Thereafter, Kaplan abandoned the plan to kill Tabak, being persuaded that Tabak was sufficiently terrified that he would no longer consider cooperating with the government.

11. Other Obstructions of Justice

In addition to giving Kaplan and Casso information that obstructed justice by helping Casso to eliminate potential witnesses against members of organized crime, including the instances described above, Eppolito and Caracappa provided information designed to allow Casso and others to escape self-incrimination or arrest. For example, in the late 1980s, Eppolito informed Kaplan that a trailer in New Jersey, used by a Lucchese Crime Family member, had been bugged and that its telephone was tapped. Kaplan passed that information to Casso; Casso relayed it to the owner of the trailer, who promptly had the bugging and wire-tapping devices removed. Eppolito also told Kaplan of a bug in a New Jersey restaurant that was owned and frequented by members of the Genovese Crime Family. Casso passed that information to the owner of the restaurant, and the members "stopped talking . . . on the bug." (Tr. 664.)

In May 1990, Eppolito made an urgent call to Kaplan and arranged to meet him on the Long Island Expressway. Eppolito gave

- 18 -

Kaplan information, which he had received from Caracappa, that Casso and Lucchese Crime Family boss Victor Amuso, among others, were about to be arrested. Kaplan alerted Amuso and tried to reach Casso; Casso was away but was alerted by Amuso. By the next day, both Amuso and Casso had become fugitives, gone "on the lam." (Tr. 683-85.)

While Casso was a fugitive, Kaplan maintained contact with him, meeting with him a score of times and continuing to relay to him sensitive law enforcement information received from Eppolito and Caracappa and to relay from Casso $4,000 a month to Eppolito and Caracappa. Casso was arrested in 1993.

12. Eppolito and Caracappa Retire from NYPD

In early 1990, Eppolito retired from NYPD. For a time, he remained in the New York area, and although he no longer had direct access to police files, he continued to participate in providing services to Kaplan and Casso. For example, in May 1990, he relayed to Kaplan information collected by Caracappa about the impending arrests of Casso and Amuso, see Part I.A.11. above; in August 1990, he advised Kaplan that Facciola was a government cooperator, see Part I.A.7. above; in November 1990, he tracked down and helped to kill Lino, see Part I.A.8. above; in 1991, he participated in the attempted murder of Tabak, see Part I.A.10. above.

In the early 1990s, Eppolito moved to Las Vegas. Kaplan

remained in contact with Caracappa, continuing to use the same covert methods of communicating with him.

Caracappa retired from NYPD in 1992. He remained in New York until, in the latter part of 1996, he too moved to Las Vegas.

13. Kaplan Becomes a Fugitive

As indicated above, Casso, having been warned of his impending arrest through information received from Eppolito and Caracappa, had become a fugitive in 1990; he was caught and arrested in 1993. In March 1994, Kaplan's attorney called Kaplan at his home in Brooklyn to alert him that Casso had probably begun to cooperate with the government. Within hours, Kaplan himself became a fugitive; he promptly left New York, and the next day he flew to the west coast, en route to Mexico.

Before leaving New York, however, Kaplan went to Caracappa's home to alert him:

> I was very embarrassed and I told Steve, I said we got a real problem and I told him Anthony Casso went bad and that I am going on the lam and that I'm coming up to tell him because I would expect that there is going to be a lot of publicity in the next couple of weeks, but I wanted him to know that I was going on the lam because he's not going to see me, that I didn't go bad, and that he could rely on me and he said to me, do you need any money. Do you--do you need me to take care of your wife? He was very gracious, and I said no, Steve. Thank you very much. I have money. And he says well, if you ever do need money in the future, just let me know, like a good friend would, and he said, I'll take care of your wife.

> And I said thank you very much. I said, but you know, there is someone else involved in this too. There's Louie. He's in Vegas already and I always felt Louie was a little flamboyant, and I said, can

you control Louie? Can you take care of the situation with him? He said, Louie's been my partner and I trust him and don't worry about it. I said okay.

(Tr. 768-69.)

Kaplan surmised to Caracappa that the government would not reach a cooperation agreement with someone who had killed as many people as Casso had unless Casso were willing to give information that was sensational. Kaplan expressed concern that Casso's cooperation would therefore focus on Eppolito and Caracappa. Kaplan knew that, despite his refusal to give Casso the detectives' names, Casso believed he knew who they were: He had told Kaplan that he had seen the pictures of Eppolito and Caracappa in Eppolito's book, Mafia Cop, and had recognized them as two of the men in the Toys "R" Us parking lot who had assisted in the Hydell kidnaping.

Kaplan's concern was, in general, prophetic. Following Casso's apparent decision to cooperate with the authorities, there was "a heavy, heavy amount of publicity" on the subject of police detectives accused of "serious, serious crimes." (Tr. 924.) Eppolito later told Kaplan that "the press," for a time, was "awful" and that Eppolito and Caracappa had retained attorneys. (Tr. 777.)

After alerting Caracappa, Kaplan fled to Mexico, where he remained for several months. He then returned to the United States to reside under an assumed name in Portland, Oregon. At the end of 1994, Kaplan moved to Las Vegas, where he remained until the summer of 1996. He then returned to New York, where he

- 21 -

was soon arrested on account of his marijuana trafficking business, see Part I.C. below.

B. Events in Las Vegas

After moving to Las Vegas in the early 1990s, Eppolito published his autobiography, Mafia Cop, in 1992. The book portrayed Eppolito as a man who had relatives in the Mafia, while he himself had rejected a life of crime and become a police detective. As indicated above, Eppolito included pictures of himself and Caracappa in the book, allowing Casso, who had never been told their names, to identify them.

1. Interactions Among Kaplan, Eppolito, and Caracappa

Kaplan, after his sojourn in Mexico, took up residence in Portland but visited Las Vegas several times to see a lady friend. During such a visit in August or September 1994, Kaplan had his friend place a call from a public telephone to Eppolito, who was listed in the telephone book, and arrange for Eppolito to meet Kaplan the next day at a local supermarket. This would be the first of several meetings between the two at that location.

Near the meeting time, Kaplan loitered around the slot machines in the market's vestibule until Eppolito arrived. The two then strolled around the supermarket, with Kaplan pushing a cart, discussing their respective situations and the publicity surrounding Casso's arrest and cooperation. Kaplan testified, "[t]his was the first time I had seen him since the problem

happened with Casso and I went on the lam, and I asked him what was going on, is he all right, is he under any pressure, is he getting any heat." (Tr. 777.) Eppolito responded that he had initially been bothered by the press, but that matters had improved.

Eppolito also told Kaplan that Caracappa would be moving to Las Vegas and was building a house diagonally across the street from Eppolito's house. Caracappa eventually moved to Las Vegas in the latter half of 1996 and indeed lived across the street from Eppolito. From the fall of 1994 until he moved to Las Vegas permanently, Caracappa visited Las Vegas several times and met with Eppolito and Kaplan, Kaplan having moved to Las Vegas at the end of 1994.

In November 1994, Kaplan offered to lend Eppolito money from Kaplan's narcotics trafficking business. Eppolito had inquired whether Kaplan could arrange for Eppolito to borrow $75,000 from a loanshark, explaining that he had made a down payment on the construction of one house, had found another house he preferred, and had been unable to persuade the builder to return his money before a new buyer was found for the first house; thus, Eppolito needed a bridge loan. Eppolito said he was willing to pay the loanshark interest of $750 a week. Kaplan, although a fugitive, had continued with his marijuana trafficking business, and he said that, rather than see Eppolito incur such an interest obligation, Kaplan would ask his marijuana supplier to agree to a delay in payment so that Kaplan could lend Eppolito the money. In

early 1995, Kaplan had cash delivered to him from New York and gave Eppolito $65,000 in 13 envelopes containing $100 bills. In 1996, Eppolito repaid $55,000, giving Kaplan $30,000 or $35,000 in cash "in an envelope that came from the bank" and "checks for the rest." (Tr. 802.) Kaplan forgave repayment of the remaining $10,000.

In early 1996, Kaplan, knowing that Caracappa's wife sold a line of clothing through the QVC home-shopping television channel and was friendly with a woman who sold jewelry on QVC, sought Caracappa's help in attempting to get QVC to offer for sale a product in which a friend of Kaplan's had an interest. Caracappa mentioned that his wife's friend was going to serve as Caracappa's alibi for the killing of Eddie Lino by saying that she and her husband had dined with Caracappa and his wife that night. Caracappa arranged for Kaplan and Kaplan's friend to meet with a QVC executive.

After moving to Las Vegas, Caracappa opened a business that provided security services. He employed Eppolito in that business. Eppolito, in the meantime, was attempting to write and sell movie screenplays. He had a film production company, of which he was president and Caracappa was vice president. Caracappa read everything that Eppolito wrote.

2. Interactions of Eppolito and Caracappa With Stephen Corso

Stephen Corso, who testified at trial, was a New York accountant who had embezzled more than $5 million from his

clients. Arrested without fanfare in 2002, he became a government cooperator, eventually posing as a Mafia associate. He moved to Las Vegas and began to frequent a restaurant that was a hangout for members of organized crime. There Corso met John Lombardozi, who described himself as an associate of the Gambino Crime Family; Lombardozi introduced Corso to John Mercaldi, who ran a prostitution business in Las Vegas and described himself as the right-hand man to Jerry Chili, the apparent successor to leadership of the Bonanno Crime Family. Corso subsequently had conversations with Chili, who told Corso to say he was "with Jerry from the Fulton Fish Market" (Tr. 1423). Mercaldi thereafter introduced Corso to others as "'with us'" and "'very good friends with Jerry.'" (Tr. 1425.) In the spring of 2003, Corso began wearing a wire to record his conversations with members of organized crime.

Mercaldi introduced Corso to Gambino Crime Family member Michael Dibari; Mercaldi and Dibari introduced Corso to John Frate. John Frate's father, to whom Corso was also introduced, was Mike Frate, who identified himself as the right-hand man to Joe Bonanno, the then-head of the Bonanno Crime Family. In October 2004, Dibari asked Corso to meet with Eppolito.

a.  Funding for Eppolito's Script-Writing Ventures

Eppolito's name had not previously been mentioned by the authorities to Corso, who, by that time, had been wearing a wire for a year and a half. Dibari said he hoped Corso could help to

raise money for the production of a movie written by Eppolito; Corso consulted FBI Special Agent Kevin Sheehan. Sheehan instructed Corso to tell Dibari that Corso had no interest in meeting Eppolito because Eppolito was a cop.

A week or 10 days later, John Frate and Mike Frate arranged to meet with Corso. At that meeting, they handed him an envelope containing Eppolito's screenplay, called "Murder at Youngstown." Corso told the Frates that he was hesitant to meet with Eppolito because Eppolito was a cop. Corso testified that in response, "Mike Fr[ate] said that he understood my concern," but that Corso "shouldn't worry" because "Lou was one of us . . . ." (Tr. 1565.)

Corso reported this meeting to Sheehan; a few days later, Sheehan gave approval for Corso to meet with Eppolito. Thereafter John Frate took Corso to meet Eppolito at Eppolito's home. Frate attended some of the ensuing meetings, as he "wanted to be a part of the whole process" "of funding the movie." (Tr. 1445.) During the next few months, Corso met with Eppolito more than 20 times. As Corso continued to wear a wire, most of his conversations with Eppolito--and later with both Eppolito and Caracappa--were recorded; at least one of the meetings with Eppolito was held in Corso's "office," in which the FBI had installed recording equipment and hidden cameras.

An early meeting of Corso, Eppolito, and John Frate to discuss funding for "Murder at Youngstown"--for which Eppolito said he needed $5 million--was attended by one of Corso's clients

who controlled a public company. The client suggested that his company could merge with Eppolito's film company and raise money through a public offering of stock. Eppolito was favorably disposed to that suggestion and said he would want some of his friends to receive stock in the offering; one of them was Caracappa.

Corso was introduced to Caracappa at the end of January 2005. He attended several dinner meetings with Eppolito and Caracappa and noted that the relationship between Eppolito and Caracappa appeared to be very close. Corso testified that at one such meeting, Caracappa told Corso he trusted Corso, and that "if he didn't trust [Corso, Corso] wouldn't be there and . . . wouldn't be meeting with Lou." (Tr. 1637.)

Eppolito was also involved in other attempts to earn money. In addition to seeking $5 million to fund "Murder at Youngstown," Eppolito told Corso he was willing to write a screenplay for or about anyone who would pay him $75,000; when Eppolito sold the screenplay, he would pay the investor 50 percent of all profits. When Corso asked if Eppolito cared what a potential investor did for a living or where the money came from, Eppolito responded, "'[n]o, I don't give a fuck about nothing'" (Tr. 1621); and, without Corso's having made any mention of narcotics trafficking (see id. at 1621-22), Eppolito said that an investor could be "the biggest drug dealer . . . in the U.S.[, Eppolito] didn't care," so long as Eppolito did not have to transport the drugs (id. at 1621; see also id. at 1622 (Eppolito

- 27 -

said, "'[s]eventy-five comes in a fucking shoebox [i.e., in cash], that is fine with me, I don't care, I had people given [sic] me money before'")).

In December 2004, Corso, on instructions from Sheehan, told Eppolito that Corso had lined up an investor who would send $75,000 for Eppolito to write a script and to send the investor 50 percent of whatever profit resulted from its sale. Corso told Eppolito that the money was narcotics proceeds from Florida; Eppolito indicated that did not care. Corso told Eppolito that the money might "be coming from somebody in the Mafia" (Tr. 1618); Eppolito indicated that he did not care. Eppolito said, "'I got people from the Gambino family that call me all of the time. [They say, y]ou know, Louie, we got money, you know[;] I says it's not a question about your money, it's you don't have enough to make the movie.'" (Tr. 1624.) Eppolito said Mike Frate "had given him $25,000 in a cardboard box in cash for a partial investment in [a] $75,000 script." (Tr. 1617-18.) Eppolito also said he would have no objection if an investor in such a script did not use his real name in signing their contract. "'He could sign it John Wayne' . . . . 'I don't care what name he uses.'" (Tr. 1627-28.)

Corso also told Eppolito that in order to avoid the filing of currency transaction reports, federally required for wire transfers of $10,000 or more, the $75,000 would be wired in installments of less than $10,000. Eventually, wire transfers totaling $14,000 were made to Eppolito's account. Although

Eppolito was initially unconcerned about the investment's fragmentation, he became irritated at the slow pace of its arrival, saying, "'[a]re they in Florida. Why didn't he send a guy with a car[.] I would have--I would have flown there and drove back.'" (Tr. 1640.)

b. The Supplying of Narcotics

Corso testified that at a dinner with Eppolito and Caracappa in mid-February 2005, he told them he was expecting a visit from four Hollywood clients, each of whom was interested in investing $75,000 in Eppolito's film project, and that his clients wanted to purchase "'designer drugs'" (Tr. 1587), specifically ecstasy and crystal methamphetamine. Corso testified that Eppolito responded that "Tony," his son, could handle it; both Eppolito and Caracappa said that Guido Bravatti, a young associate of Caracappa's, could handle it. Later that night, Eppolito called Corso to give him Bravatti's telephone number.

On the following evening, Corso had dinner with Tony and Bravatti. Corso told them that his clients wanted an ounce of crystal methamphetamine and six to eight ecstasy pills; Bravatti said there would be no problem. Tony and Bravatti indicated that they wanted to do all they could to facilitate investments by Corso's clients in Eppolito's film project.

The next day, Tony and Bravatti made a partial delivery at Corso's office, saying that they had had some difficulty in obtaining what Corso requested. They handed him an envelope

containing somewhat less than the requested ounce of crystal methamphetamine, and Corso paid them proportionately. The parties stipulated at trial that that envelope had contained 25.4 grams of 64-percent-pure methamphetamine.

Tony and Bravatti never delivered to Corso ecstasy or any additional methamphetamine. On March 3, 2005, Corso had dinner with Eppolito, who was quite upset and told Corso not to call Tony or Bravatti any more. Eppolito refused to tell Corso why he was upset but became more congenial during the dinner. Corso did not again attempt to reach Tony or Bravatti. On March 9, 2005, Eppolito and Caracappa were arrested.

C. Kaplan Eventually Decides To Cooperate

In the spring of 1996, one of Kaplan's New York attorneys had informed him that it no longer appeared that Casso would be a government witness. Kaplan returned to New York in the summer of 1996. In September 1996, he was arrested and charged with narcotics trafficking. He testified that the authorities appeared to be more interested in having him identify Eppolito and Caracappa--though no names were mentioned--than in prosecuting him for his marijuana offenses:

> When I was arrested, I was taken into DEA headquarters and when I walked into the room, when they brought me in, they had about fifteen to twenty people in there and there was high ranking members of the New York Police Department, inspectors, and there was FBI agents, and DEA people. . . . The police department said, listen, you could help yourself out here real quick. We're interested in two dirty cops. . . .

> . . . .

> . . . We are interested in two dirty cops and if you want to help yourself, you want to--if you help us, then tell us what you know about two dirty cops.

(Tr. 806-07.) Kaplan declined to make any statements. He was tried for and convicted of conspiracy to distribute marijuana; he was sentenced to 27 years in prison.

Both during his trial and after he was convicted, law enforcement agents made repeated efforts to persuade Kaplan to cooperate. Kaplan continued his silence for some eight years.

In the latter half of 2004, Kaplan--then 70-odd years of age--decided to cooperate with the government, including in the prosecution of Eppolito and Caracappa. At trial, he explained why:

> I was in jail nine straight years. I was on the lam two and a half years before it. In that period of time I seen an awful lot of guys that I thought were standup guys go bad, turn and become informants.

> . . . .

> And after nine years, I felt that [Eppolito and Caracappa] were going to be indicted by the state on this case, . . . and I didn't think that they would stand up and I was tired of going to jail by myself, and I would be at the defense table now and Steve and Louie would be sitting up here.

(Tr. 454; see also id. at 813 ("I felt that one of them or both of them would make a deal and then I would be the defendant").)

D. The Jury's Verdicts

As indicated above, Count One of the Indictment charged Eppolito and Caracappa with participating in a RICO conspiracy

- 31 -

that began in May 1979 and ended in March 2005. Count Two charged Eppolito with money laundering in connection with his attempts in 2004-2005 to receive proceeds of narcotics trafficking; the two remaining counts charged Eppolito and Caracappa with distributing, possessing with intent to distribute, and conspiring with others to distribute five or more grams of methamphetamine. The racketeering acts alleged in Count One included the murders, attempted murders, kidnapings, and obstructions of justice between 1986 and 1991, described in Part I.A. above; Eppolito's conspiracy between 1994 and 1996 to engage in unlawful monetary transactions with respect to proceeds from Kaplan's narcotics trafficking business, described in Part I.B.1. above; Eppolito's attempted money laundering of narcotics proceeds in 2004-2005, described in Part I.B.2.a. above; and narcotics trafficking by Eppolito and Caracappa in 2005, described in Part I.B.2.b. above.

Prior to trial, Eppolito and Caracappa moved pursuant to Fed. R. Crim. P. 12(b) to dismiss the RICO conspiracy count on, inter alia, statute-of-limitations grounds. They argued that the Indictment failed to allege sufficiently that the supposed enterprise and pattern of racketeering activity continued past the termination of their employment with NYPD and/or their respective relocations to Las Vegas in the 1990s. As Eppolito and Caracappa were not indicted until March 9, 2005, they contended that no part of the alleged RICO conspiracy offense was committed within the five-year limitations period. The district court denied their

motion on the ground that the issue could not be decided on the face of the Indictment but would depend on the evidence presented at trial.

In its summation at trial, the government urged the jury to reject any suggestion by Eppolito or Caracappa that the RICO conspiracy ended when they retired from NYPD in the early 1990s, or when they moved to Las Vegas, or when Kaplan was arrested in 1996. The Assistant United States Attorney argued that "the principal purpose[] of the enterprise was to make money," and defendants' ancillary purpose was to "conceal[] their involvement in the conspiracy," in order "to protect their ability to make money." (Tr. 2967.) He urged the jury not to

> be fooled into thinking that the conspiracy ended when the defendants retired from the force. The evidence shows, ladies and gentlemen, that Eddie Lino was killed after Detective Eppolito retired from the force. The attempt on Herman Tabak's life came after Eppolito retired from the force. The money laundering activity that Eppolito engaged in with Mr. Kaplan in Las Vegas occurred after [Eppolito and Caracappa] had retired and, of course, the activities in 2004 and 2005 with Corso occurred after they left the police force.

(Tr. 2967-68.) Thus, the government argued that the RICO conspiracy had spanned the entire period alleged in the Indictment, as Eppolito and Caracappa "received money for each crime in New York and they broke the law for money in Las Vegas." (Tr. 2967.)

In instructing the jury with respect to defendants' contention that the statute of limitations barred their

prosecution on the RICO conspiracy count, the district court stated as follows:

> The statute of limitations is designed to bar conviction on racketeering crimes that ended five years or more before the prosecution began by indictment. The indictment here was handed down on March 9, 2005. In order to convict the defendant of racketeering conspiracy, you must find first that the charged enterprise continued to exist as of March 9, 2000, five years before; that the single conspiracy charged in count one continued to exist as of March 9, 2000; and that the defendant continued to be a member of the conspiracy as of March 9, 2000.
>
> A racketeering conspiracy continues to exist until the purpose or objective of the conspiracy is either accomplished or abandoned.
>
> Here the indictment alleges that the principal purpose of the enterprise was to generate money for its members and associates by means of various legal and illegal activities. If you find that one or both of the defendants were at one time engaged in a racketeering conspiracy involving the charged enterprise but that the enterprise was no longer in existence as of March 9, 2000, you must acquit the defendants of the conspiracy charged in count one of the indictment.
>
> If you find that one or both of the defendants were engaged in a racketeering conspiracy but that the conspiracy was not ongoing as of March 9, 2000, you must acquit the defendants of the conspiracy charged in count one.
>
> If you find that the conspiracy was still ongoing as of March 9, 2000 but that the particular defendant was no longer a member of the conspiracy as of that date, you must acquit that defendant of the conspiracy charged in count one of the indictment.

(Tr. 3268-70 (emphases added).)

The court also pointed out that while both Eppolito and Caracappa denied that there was a conspiracy and that they were members of a conspiracy as charged, "each of the defendants ha[s] raised a defense that even if the conspiracy charged existed, he

was not a member as of March 9, 2000 because he withdrew from the conspiracy prior to that date." (Tr. 3270.) The court instructed that the burden of proof on the defense of withdrawal was on the defendant asserting the defense:

> Once a person joins a conspiracy of this type, that person remains a member until he withdraws from it. Any withdrawal must be complete and it must be done in good-faith. A person can withdraw from a conspiracy by taking some affirmative steps to terminate or abandon his participation in and efforts to promote the conspiracy. The defendant must have demonstrated some type of positive action which disavowed or defeated the purpose of the conspiracy.

> By way of an example, a defendant may withdraw from the conspiracy by giving a timely warning to the proper law enforcement officials; by wholly depriving his prior efforts of effectiveness in the commission of the crime; by putting himself [in] a position where he could not participate in the conspiracy; by making appropriate efforts to prevent the commission of a crime connected with the conspiracy; or by doing acts which are inconsistent with the objects of the conspiracy and making reasonable efforts to communicate those acts to his coconspirators.

> Now, on this issue of withdrawal, the defendant has the burden of proving whether he withdr[e]w from the conspiracy by a preponderance of the evidence. The burden is on him.

(Tr. 3270-71.) The court cautioned, however, that

> [t]he fact that a defendant has raised this defense does not . . . relieve the government of its burden of proving that there was an agreement and that the defendant knowingly and voluntarily joined it and that it continued until at least March 9, 2000.

> Those are things the government must still prove beyond a reasonable doubt in order for you to convict the defendant of the crime of conspiracy.

(Tr. 3272.)

- 35 -

The court distributed to the jurors a verdict sheet that set out all of the issues the jury was to resolve. These included, as to each defendant and as to each specific racketeering act alleged against him, a question as to whether the government had proved that he agreed to participate in that act. With regard to the statute-of-limitations issue, a question was posed with respect to the continuation or ending of the alleged RICO conspiracy. After defense counsel objected to a question in the form, "Do you find that the conspiracy charged in Count One continued to March 9th, 2000" (Tr. 3334), the jury was asked:

> Do you find that the conspiracy charged in Count One ended prior to March 9, 2000?

The jury found Eppolito and Caracappa guilty on all of the counts in which they were charged. Finding them guilty of the RICO conspiracy charged in Count One of the Indictment, the jury found that each defendant had agreed to participate in each of the racketeering acts alleged against him. As to whether it "f[ou]nd that the conspiracy charged in Count One ended prior to March 9, 2000," the jury answered "No."

E. The District Court's Statute-of-Limitations-Based Order of Acquittal on the RICO Conspiracy Count

After the verdict, Eppolito and Caracappa made various motions to set aside the verdicts. To the extent pertinent to this appeal, Eppolito and Caracappa moved pursuant to Fed. R. Crim. P. 29 for judgments of acquittal on the RICO conspiracy count, arguing that the evidence at trial was insufficient to

- 36 -

establish that the charged enterprise continued to exist as late as March 9, 2000, or that the enterprise was conducted through a pattern of racketeering activity that continued to that date. In a Memorandum, Order and Judgment dated June 30, 2006, reported at 436 F.Supp.2d 532 ("Eppolito I"), the court granted that motion. Its reasoning was as follows:

> In the present case, the government proved beyond a reasonable doubt that the defendants conspired to conduct the affairs of an enterprise through a pattern of racketeering activity. Moreover, although it was not required by the charges in the indictment, the government proved that the defendants. in fact engaged in a pattern of racketeering activity through their involvement in at least eight murders, two kidnapings, and various acts of bribery, tampering, retaliation, and obstruction of justice. The defendants, together with Frank Santoro, Jr. and Burton Kaplan, established a "subcontracting" arrangement with members of organized crime, represented primarily by co-conspirator Anthony Casso. Through this enterprise, the defendants exploited their positions as present or past officers of the New York City police department in order to supply confidential law enforcement information to Casso and to carry out murders and kidnapings under color of law. In exchange for their services, the defendants were highly compensated, receiving a retainer of 4,000 dollars a month for years and an additional 25,000 to 65,000 dollars per murder contract.

> It is unclear precisely when this conspiracy came to an end. It could be seen as having ended when defendant Caracappa retired from the police department in 1992, or when Casso, the defendants' primary "client," was arrested in 1993. It may have lasted until Kaplan moved back to New York and was arrested in 1996. Up until that point, some remnant of the original enterprise arguably remained, and there was a possible--although minuscule--threat of continued racketeering activity connected to that enterprise.

> But once Anthony Casso and Burton Kaplan had both been arrested, once the two defendants had both retired from the police force and re-established

- 37 -

themselves on the opposite side of the country, the conspiracy that began in New York in the 1980s had come to a definite close. The defendants no longer had access to confidential law enforcement information and were no longer in contact with their old associates in the Lucchese crime family. Their enterprise had effectively been put out of business by their own retirements and their compatriots' arrests. . . .

The government's inclusion of the four Nevada acts does not serve to lengthen the life of this conspiracy to within the five-year statute of limitations. The government maintains that the jury could have determined that these four acts were evidence of a continuing business venture on the part of the defendants--a sort of "mom and pop" general store of crime--through which they sold members of organized crime whatever services they were in a position to provide from 1986 until their arrests in 2005. This theory was not supported by the evidence at trial.

While the 1994-1996 monetary transaction involved two members of the earlier racketeering conspiracy--namely, Burton Kaplan and defendant Eppolito--this act was essentially a personal loan from Kaplan to Eppolito, unconnected to the original enterprise or to any other enterprise with which the defendants had been associated. . . . The proceeds for this loan came from Kaplan's marijuana trafficking business, in which neither of the defendants had ever participated. Kaplan himself explicitly testified that, while the defendants had on occasion volunteered their "law enforcement" services in aid of this business, he had turned them down because it "had nothing to do with" the other crimes he was committing with them during the late 1980s and early 1990s. Eppolito's agreement to take marijuana proceeds from Kaplan was in no way a sale of his or Caracappa's "services" to Kaplan. Rather, it was a favor performed by Kaplan for Eppolito, tinged, as favors between criminals often are, by an acceptance of complicity on the part of the one receiving the favor.

As for the 2004-2005 money laundering and narcotics charges, these crimes are also most accurately characterized as singular, "sporadic" acts of criminality--precisely the sort of criminal activity not covered by the laws against racketeering. . . . Drawing every inference in favor

of the government, . . . _these acts could **at best** be seen as having been performed in furtherance of a new enterprise, unconnected to the original one and conducted through an entirely different type of activity_. . . .

After Eppolito retired from the New York City police department and moved to Las Vegas, he attempted a transition from the world of law enforcement to the world of entertainment. In pursuit of this goal, Eppolito established an ostensibly legitimate enterprise, "DeAntone Productions," and began seeking investors in his screenplays, many of which were about the world of organized crime. According to documents admitted by the government, Eppolito was the president of this company and Caracappa a vice president.

The final three racketeering acts were committed as a result of Eppolito's attempts to find investors for a particular film project: the money laundering grew out of Eppolito's agreement to accept funds from an investor described by government informant Steven Corso as a "mob guy in Florida involved in a drug deal," and the narcotics charges arose from both defendants' arguable willingness to help Corso obtain drugs that would keep prospective investors happy. None of these acts displayed the sort of fee-for-services arrangement typified by the New York acts and alleged by the government to be the essence of the defendants' continuing enterprise.

The government's attempts to rely on the nexus of organized crime to connect the New York and Nevada acts are unavailing, considering the significant differences between them. That Eppolito tangentially relied on his knowledge of, and prior association with, organized crime in his attempts to find investors for his new screenwriting endeavor is not surprising, nor is it in and of itself evidence that this enterprise was the same as the original one. A retired contractor who opens a delicatessen in his retirement may encourage his old employees and clients to buy their lunches at his new store, and time on job sites may have taught him what brand of pastrami those customers will prefer; that does not mean that he remains in the construction business.

Eppolito I, 436 F.Supp.2d at 571-73 ("at best" emphasized in original) (other emphases ours).

The court also rejected the government's alternative contention that prosecution of the RICO conspiracy count was timely because the members of the enterprise had agreed to maintain secrecy about the existence of the enterprise, their participation in it, and their prior crimes, and that that agreement continued until the date of their arrests. See id. at 573.

Having concluded that judgments of acquittal should be entered in favor of each defendant on the RICO conspiracy count, the court also opined that, given the "overwhelming evidence" on that count that Eppolito and Caracappa were "heinous criminals . . . guilty . . . of the most despicable crimes of violence and treachery," id. at 576, that evidence may have unfairly affected the jury's consideration of the other three counts of the Indictment. Accordingly, the court ruled that if its dismissal of the RICO conspiracy count were not overturned on appeal, Eppolito and Caracappa would be given a new trial on those other counts.

## II. DISCUSSION

On appeal, the government contends that the district court erred in entering judgments of acquittal on the RICO conspiracy count, arguing that the verdicts finding Eppolito and Caracappa guilty on that count may be upheld on either of two bases. First, it argues that the evidence was sufficient to support findings that the RICO enterprise whose purpose was to gain money for its

participants by providing services to members and associates of organized crime--and defendants' conspiracy to conduct that services enterprise through a pattern of racketeering activity--continued well past March 8, 2000. Second, the government contends that part of the RICO conspiracy, from its inception, was an actual agreement to conceal the existence of the enterprise and its racketeering activity, designed both to hide the participants' past crimes and to permit them to engage in further crimes. It argues that there was sufficient evidence to permit the jury to find that such an agreement existed and to find that it did not end before Eppolito and Caracappa were arrested.

In light of the principles governing our standard of review and the general principles governing conspiracy crimes, statutes of limitations, and the RICO elements of enterprise and pattern of racketeering activity, we find merit in the government's first contention and need not address the second.

A. The Standard of Review

Rule 29 of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The test for sufficiency, as noted by the district court here, is "whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." Eppolito I, 436 F.Supp.2d at 568. The court must make that determination with

"the evidence against a particular defendant . . . viewed in a light that is most favorable to the government, . . . and [with] all reasonable inferences . . . resolved in favor of the government. . . . The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation." Id.

Our mandate on appeal reflects the same standard, as we review the grant or denial of a judgment of acquittal under Rule 29 de novo. See, e.g., United States v. Temple, 447 F.3d 130, 136 (2d Cir.), cert. denied, 127 S. Ct. 495 (2006). We may properly affirm a judgment of acquittal under Rule 29 only if we conclude, considering all of the evidence, direct and circumstantial, that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003). We must reverse a district court's post-conviction Rule 29 judgment of acquittal if, "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in Jackson)); see, e.g., United States v. Scop, 846 F.2d 135, 138-39 (2d Cir.) (applying same standard to review of claims of "insufficient evidence of overt acts in furtherance of the conspiracy within the five-year period prior to the indictment"), outcome altered on rehearing on other grounds, 856 F.2d 5 (2d Cir. 1988).

Viewing the evidence in the light most favorable to the government means "'crediting every inference that the jury might have drawn in favor of the government,'" United States v. Temple, 447 F.3d at 136-37 (quoting United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999)), and recognizing that the government's evidence need not exclude every other possible hypothesis, see, e.g., United States v. Espaillet, 380 F.3d at 718; United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir.), cert. denied, 516 U.S. 1001 (1995); United States v. Ragosta, 970 F.2d 1085, 1090 (2d Cir.), cert. denied, 506 U.S. 1002 (1992). As "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence," United States v. Jackson, 335 F.3d at 180, when there are such competing inferences, we must defer "to the jury's choice," United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). "The ultimate question is not whether we believe the evidence adduced at trial established [the pertinent fact], but whether any rational trier of fact could so find." United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998) (emphases in original). This

> traditional deference accorded to a jury's verdict "is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel."

United States v. Jackson, 335 F.3d at 180 (quoting United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992)).

- 43 -

B. Statutes of Limitations

To the extent pertinent here, § 3282 of Title 18, which governs the time within which most noncapital federal offenses may be prosecuted, provides that

> no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

18 U.S.C. § 3282(a). Statutes of limitations are statutes of repose. Those applicable to criminal prosecutions are principally

> designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past.

Toussie v. United States, 397 U.S. 112, 114-15 (1970). "'[S]tatutes of limitations normally begin to run when the crime is complete.'" Id. at 115 (quoting Pendergast v. United States, 317 U.S. 412, 418 (1943)).

The time at which a crime is "complete" depends largely on the nature of the crime. Some crimes are "instantaneous"; others are "continuing." Toussie, 397 U.S. at 122; United States v. Kissel, 218 U.S. 601, 608-09 (1910). "A 'continuing offense' is, in general, one that involves a prolonged course of conduct; its commission is not complete until the conduct has run its course." United States v. Rivera-Ventura, 72 F.3d 277, 281 (2d Cir. 1995); see generally United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1190 (2d Cir.) ("Beech-Nut") (noting that possession of drugs with intent to distribute is a continuing crime, whereas

- 44 -

receipt of stolen goods is a noncontinuing crime), cert. denied, 493 U.S. 933 (1989).

> Though some conduct, even before it is concluded, may fit the statutory definition of a crime, thereby permitting institution of a prosecution before the offense is complete, see, e.g., United States v. Cores, 356 U.S. [405, 408-09 (1958)], the limitations period for a continuing offense does not begin until the offense is complete, see, e.g., Toussie, 397 U.S. at 115 . . . .

United States v. Rivera-Ventura, 72 F.3d at 281.

There is, of course, an apparent "tension between the purpose of a statute of limitations and the continuing offense doctrine . . . ; the latter, for all practical purposes, extends the statute beyond its stated term." Toussie, 397 U.S. at 115 (internal quotation marks omitted). Nonetheless, such an extension is required where "the explicit language of the substantive criminal statute [at issue] compels [the] conclusion" that Congress intended the offense in question to be construed as a continuing one, as where "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one," id., or where the statutory language describing the offense "contemplates a prolonged course of conduct," id. at 120.

Conspiracy is generally a continuing crime. See, e.g., Toussie, 397 U.S. at 122; Kissel, 218 U.S. at 607-08. "It is in the nature of a conspiracy that each day's acts bring a renewed threat of the substantive evil Congress sought to prevent." Toussie, 397 U.S. at 122. As conspiratorial conduct constitutes a continuing crime, a conspiracy offense "is not complete until the

purposes of the conspiracy have been accomplished or abandoned," United States v. Rastelli, 870 F.2d 822, 838 (2d Cir.), cert. denied, 493 U.S. 982 (1989); see, e.g., United States v. Spero, 331 F.3d 57, 61 (2d Cir.) ("Spero"), cert. denied, 540 U.S. 819 (2003). "[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement . . . ." Grunewald v. United States, 353 U.S. 391, 397 (1957).

C. <u>General Conspiracy Principles</u>

The essence of the crime of conspiracy, of course, "'is the agreement . . . to commit one or more unlawful acts.'" United States v. Jones, 482 F.3d 60, 72 (2d Cir. 2006) ("Jones") (quoting Braverman v. United States, 317 U.S. 49, 53 (1942)), cert. denied, 127 S. Ct. 1306 (2007). Where there is an agreement to commit an unlawful act, "[t]hat agreement is 'a distinct evil,' which 'may exist and be punished whether or not the substantive crime ensues.'" United States v. Jimenez Recio, 537 U.S. 270, 274 (2003) (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)) (emphasis ours). "Where, as here, the indictment contains a conspiracy charge, 'uncharged acts may be admissible as direct evidence of the conspiracy itself.'" United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (quoting United States v. Thai, 29 F.3d 785, 812 (2d Cir.), cert. denied, 513 U.S. 977 (1994)), cert. denied, 524 U.S. 905 (1998).

"'[I]n order to prove a single conspiracy,'" rather than multiple conspiracies, "'the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.'" United States v. Berger, 224 F.3d 107, 114 (2d Cir. 2000) ("Berger") (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990) ("Maldonado-Rivera")); see, e.g., United States v. Martino, 664 F.2d 860, 876 (1981), cert. denied, 458 U.S. 1110 (1982). "'The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.'" Berger, 224 F.3d at 114 (quoting Maldonado-Rivera, 922 F.2d at 963). Indeed, in order for a single conspiracy to be found, it is not necessary that the conspirators even know the identities of all the other conspirators. See, e.g., Blumenthal v. United States, 332 U.S. 539, 557 (1947); Jones, 482 F.3d at 72; United States v. Gleason, 616 F.2d 2, 16 (2d Cir. 1979), cert. denied, 444 U.S. 1082 (1980). Where an alleged conspiracy "encompass[es] members who neither know one another's identities . . . nor specifically know of one another's involvement," United States v. Sureff, 15 F.3d 225, 230 (2d Cir. 1994), it is permissible for the jury to find that there was a single conspiracy so long as a reasonable juror could conclude "beyond a reasonable doubt '(1) that the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment, and (2) that the defendant participated in the alleged enterprise with a consciousness of its general nature and

extent.'" United States v. Rosa, 11 F.3d 315, 340 (2d Cir. 1993) (quoting Beech-Nut, 871 F.2d at 1192), cert. denied, 511 U.S. 1042 (1994).

Nor need the goals of all the participants be congruent for a single conspiracy to exist, so long as the participants agree on the "essential nature" of the enterprise and "their goals are not at cross purposes." Beech-Nut, 871 F.2d at 1192 (internal quotation marks omitted); see, e.g., United States v. Heinemann, 801 F.2d 86, 92 & n.1 (2d Cir. 1986), cert. denied, 479 U.S. 1094 (1987). In an ordinary bribery conspiracy, for example, the goals of the participants are not congruent, for the goal of the payer of the bribe is to influence an action or decision by the bribe's recipient; the goal of the bribe's recipient is to obtain money.

Further, "[c]hanges in membership, differences in time periods, and/or shifting emphases in the location of operations do not necessarily require a finding of more than one conspiracy." Jones, 482 F.3d at 72; see, e.g., United States v. Martino, 664 F.2d at 876-77; United States v. Vila, 599 F.2d 21, 24 (2d Cir.), cert. denied, 444 U.S. 837 (1979). "[C]hanges in membership do not necessarily convert a single conspiracy into multiple conspiracies, . . . especially where the activity of a single person was 'central to the involvement of all.'" United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) (quoting United States v. Moten, 564 F.2d 620, 625 (2d Cir.), cert. denied, 434 U.S. 942 (1977)). And "'a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may

involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.'" Berger, 224 F.3d at 114-15 (quoting Maldonado-Rivera, 922 F.2d at 963); see, e.g., United States v. Williams, 205 F.3d 23, 33 (2d Cir.) (single conspiracy not transformed into multiple conspiracies "simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations") (internal quotation marks omitted), cert. denied, 531 U.S. 885 (2000); United States v. Tramunti, 513 F.2d 1087, 1106 (2d Cir.), cert. denied, 423 U.S. 832 (1975).

Where a conspiracy statute, such as 18 U.S.C. § 1962(d), does not require proof of an overt act and the indictment alleges a "conspiracy [that] contemplates a continuity of purpose and a continued performance of acts," Spero, 331 F.3d at 60 (internal quotation marks omitted), and the government has introduced sufficient evidence to show that such a conspiracy existed, the conspiracy "is presumed to exist until there has been an affirmative showing that it has been terminated," id. (emphasis in Spero) (internal quotation marks omitted); see id. at 60-61. "[A] RICO conspiracy continues until the objectives of the conspiracy are either accomplished or abandoned." Id. at 61 (internal quotation marks omitted); see, e.g., United States v. Rastelli, 870 F.2d at 838; United States v. Persico, 832 F.2d 705, 713 (2d Cir. 1987), cert. denied, 486 U.S. 1022 (1988). Thus, "the statute of limitations for a RICO conspiracy does not begin to run until the objectives of the conspiracy have been either

achieved or abandoned." United States v. Eisen, 974 F.2d 246, 264 (2d Cir. 1992) ("Eisen"), cert. denied, 507 U.S. 1029 (1993); see, e.g., United States v. Persico, 832 F.2d at 713.

Where the government has presented sufficient evidence to show a conspiracy that has continuing purposes or goals, the burden is on the defendant to prove that the conspiracy was terminated or that he took affirmative steps to withdraw. See, e.g., Spero, 331 F.3d at 60-61; United States v. Flaharty, 295 F.3d 182, 192 (2d Cir.), cert. denied, 537 U.S. 936 (2002); United States v. James, 609 F.2d 36, 41 (2d Cir. 1979), cert. denied, 445 U.S. 905 (1980). To show that the conspiracy was terminated, the defendant "need[s] to present evidence from which the jury could . . . f[i]nd that the goals of the conspiracy were accomplished in some final manner." Spero, 331 F.3d at 61 (emphasis added). For a defendant to show that he withdrew from the conspiracy, proof merely that he ceased conspiratorial activity is not enough. See, e.g., Eisen, 974 F.2d at 268. He must also show that he performed "some act that affirmatively established that he disavowed his criminal association with the conspiracy," id. (internal quotation marks omitted), "'either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators,'" Berger, 224 F.3d at 118 (quoting United States v. Borelli, 336 F.2d 376, 388 (2d Cir. 1964), cert. denied, 379 U.S. 960 (1965)). And "the defendant must not take any subsequent acts to promote the

- 50 -

conspiracy" or "receive any additional benefits from the conspiracy." Berger, 224 F.3d at 118.

D. The RICO Enterprise and Pattern Requirements

To the extent pertinent to this case, the normative sections of RICO provide as follows:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

18 U.S.C. §§ 1962(c), (d) (emphases added). RICO defines "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Id. § 1961(4). The existence of an enterprise may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). An "individuals associated in fact" enterprise, 18 U.S.C. § 1961(4), may continue to exist even though it undergoes changes in membership. See, e.g., United States v. Coonan, 938 F.2d 1553, 1560-61 (2d Cir. 1991), cert. denied, 503 U.S. 941 (1992).

The RICO statute defines "'racketeering activity'" to include crimes such as murder, kidnaping, bribery, and controlled substance offenses that are felonies under state law; drug trafficking crimes that are felonies under federal law; and other federal crimes such as obstructing a criminal investigation, retaliating against a witness, money laundering, and engaging in monetary transactions in property derived from specified unlawful activity. 18 U.S.C. §§ 1961(1)(A), (B), (D).

As discussed below, a "pattern of racketeering activity is . . . a series of criminal acts as defined by the statute." Turkette, 452 U.S. at 583. The evidence used to establish the enterprise and the pattern "may in particular cases coalesce," id.; and "evidence of prior uncharged crimes and other bad acts that were committed by defendants[]" may be "relevant . . . to prove the existence, organization and nature of the RICO enterprise, and a pattern of racketeering activity by each defendant[]," United States v. Diaz, 176 F.3d 52, 79 (2d Cir.), cert. denied, 528 U.S. 875 (1999).

RICO provides that a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter [i.e., October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The Supreme Court in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989), noted that this provision "does not so much

define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern," and that it "places an outer limit on the concept of a pattern of racketeering activity that is broad indeed." Id. at 237. The Court noted that the dictionary definition of "'pattern' is an 'arrangement or order of things or activity,'" id. at 238 (quoting 11 Oxford English Dictionary 357 (2d ed. 1989)) (emphasis ours), and it pointed out that

> the mere fact that there are a number of predicates is no guarantee that they fall into any arrangement or order. It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them "ordered" or "arranged." The text of RICO conspicuously fails anywhere to identify, however, forms of relationship or external principles to be used in determining whether racketeering activity falls into a pattern for purposes of the Act.

H.J. Inc., 492 U.S. at 238 (emphasis added). The Court concluded that

> [i]t is reasonable to infer, from this absence of any textual identification of sorts of pattern that would satisfy § 1962's requirement, in combination with the very relaxed limits to the pattern concept fixed in § 1961(5), that Congress intended to take a flexible approach, and envisaged that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set.

Id. (emphasis added).

Looking to RICO's legislative history, the Court found discussions showing that Congress used the term "pattern" in order to exclude activity that was "isolated" or "sporadic" and to require instead "the showing of a relationship between the

- 53 -

predicates, . . . and of the threat of continuing activity." Id. at 239 (internal quotation marks omitted). "'It is this factor of continuity plus relationship which combines to produce a pattern.'" Id. (quoting Report of the Senate Judiciary Committee, S. Rep. No. 91-617, 91st Cong., 1st Sess. (Dec. 18, 1969), at 158) (emphasis in H.J. Inc.). The Court concluded that "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc., 492 U.S. at 239 (emphasis in original).

As to relatedness, the H.J. Inc. Court noted that in another part of the legislation that included RICO, Congress had stated that "[c]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at 240 (internal quotation marks omitted). The Court concluded that there was no reason to suppose that Congress had intended any more constrained a notion as to what relationships between RICO predicate acts would suffice to show a pattern of racketeering activity. See id.

As to the continuity component of the RICO pattern element, the Court noted that while continuity and relatedness are concepts that are analytically separate, proof of the two "will often overlap." Id. at 239. The Court noted that "the threat of

continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." Id. at 242-43 (emphasis added). But because continuity or its threat may be proven "in a variety of ways," it is "difficult to formulate in the abstract any general test for continuity." Id. at 241 (emphasis added). With no general abstract test for continuity, and with "the uncertainty inherent in RICO's pattern component," the Court observed that "[t]here is no obviously 'correct' level of generality for courts to use in describing the criminal activity alleged in RICO litigation." Id. at 241 n.3.

E. Evidence as to the Continuation of the "Services" Enterprise

In the present case, the determinations as to whether an enterprise conducted by Eppolito and Caracappa continued to exist into the limitations period, and as to whether the early acts and the later acts were part of the same pattern of racketeering activity, depend on the level of generality at which the racketeering enterprise is defined. Our principal difficulty with the district court's statute-of-limitations-based acquittal as a matter of law is that the court's views of the enterprise, its purposes, its location, and its duration were more restricted than what was alleged in the Indictment and than what the jury could infer from the evidence at trial.

To begin with, the district court stated that the enterprise "consisted of" Eppolito, Caracappa, Santoro, Kaplan,

and Casso (and unnamed others), Eppolito I, 436 F.Supp.2d at 539, and was a "'subcontracting'" arrangement that Kaplan, Santoro, Eppolito, and Caracappa had "with members of organized crime, represented primarily by co-conspirator Anthony Casso," id. at 571. The court stated that in "this enterprise," Eppolito and Caracappa "exploited their positions as present or past officers of the New York City police department in order to supply confidential law enforcement information to Casso and to carry out murders and kidnapings under color of law." Id. (emphasis added). The court ruled that, although perhaps ending even earlier, "this conspiracy" came to a "definite close" when Eppolito and Caracappa retired from NYPD and moved to Las Vegas, "no longer had access to confidential law enforcement information[,] and were no longer in contact with their old associates in the Lucchese crime family." Id. This view was at odds with the generality with which the enterprise was alleged in the Indictment.

The Indictment loosely alleged that the RICO "enterprise" comprised "a criminal organization" and "its members and associates," that its leaders included Eppolito and Caracappa, and that its members and associates "[a]t various times" included Santoro, Kaplan, and Casso, as well as unnamed others. (Indictment ¶¶ 1, 2, 6.) The district court's view that, as a matter of law, the RICO enterprise and the RICO conspiracy must have ceased to exist no later than when both Casso and Kaplan were in prison failed to recognize that Eppolito and Caracappa

- 56 -

themselves could constitute a RICO enterprise as defined by 18 U.S.C. § 1961(4) and interpreted by the Supreme Court in Turkette, see Part II.D. above. There was evidence that Eppolito and Caracappa referred to themselves as partners, that they were associated in fact, and that they functioned as a continuing unit. For example, while they were employed by NYPD in the 1980s, they collaborated to provide confidential law enforcement information to Kaplan and Casso. During both the period in which both Eppolito and Caracappa were police detectives and the period following Eppolito's retirement from NYPD in early 1990, Eppolito and Caracappa committed kidnapings and murders together. In Las Vegas in the 1990s, Eppolito started a film production company in which Caracappa was vice president. Caracappa started a security business in which he employed Eppolito. When Corso inquired about a source for designer drugs for clients who might be willing to invest in Eppolito's film, Eppolito called Corso to give him the telephone number of an associate of Caracappa. When Eppolito and Caracappa met with Corso in 2005, Caracappa said he trusted Corso and that if Caracappa didn't trust him, Corso would not be doing business with Eppolito.

On this record, we cannot conclude that the association of Eppolito and Caracappa as partners in providing services to members and associates of organized crime had ceased to exist before March 9, 2000, as a matter of law. That issue was within the province of the jury to decide as a question of fact, and the record provided ample evidence to permit the jury to find that

- 57 -

that enterprise continued to exist well into the five-year period that preceded the commencement of this prosecution.

Further, the goals of the enterprise as alleged in the Indictment were considerably more general than the goal described by the district court in its opinion. The Indictment alleged that

> [t]he principal purpose of the Enterprise was to generate money for its members and associates. This purpose was implemented by members and associates of the Enterprise through various legal and illegal activities, including murder, attempted murder, assault, kidnaping, criminal facilitation, bribery, obstruction of justice, extortion, fraud, money laundering, tax evasion and narcotics trafficking.

(Indictment ¶ 3 (emphases added).) Thus, although the Indictment also alleged that the purposes of the enterprise included the purchase and sale of confidential law enforcement information, it in no way suggested that the enterprise's purpose was limited to that activity. And despite the more restrictive view stated in the district court opinion, i.e., that the RICO enterprise was based solely on the access of Eppolito and Caracappa to official law enforcement information and their conduct "under color of law," Eppolito I, 436 F.Supp.2d at 571, the jury was not required to adopt that view.

The jury could well have inferred that Eppolito and Caracappa sometimes sold their services to Kaplan and/or Casso in New York as "hit" men in instances that did not require their access to law enforcement information and did not call upon their NYPD connections. For example, our attention has not been called to any evidence to show that Eppolito and Caracappa used law enforcement information in connection with the killing of Eddie

- 58 -

Lino; and for that mission, Casso provided the guns. Similarly, in Kaplan's testimony describing his hiring of Eppolito and Caracappa to kill Greenwald and Tabak, there was no suggestion that Eppolito and Caracappa were called upon to use any law enforcement information. Kaplan testified that he obtained Tabak's home and work addresses and the make of Tabak's car from another coconspirator. (See Tr. 749-50.)

Further, there was evidence that defendants' retirements from NYPD did not end their association with each other or with Kaplan. Eppolito retired from NYPD in 1990 and, as summarized in Part I.A.12. above, continued to collaborate with Caracappa in providing services to Kaplan. And after Caracappa retired from NYPD in 1992 and went to work for a new employer who provided him with a beeper, Caracappa gave his beeper number to Kaplan. Kaplan retained that number (or an updated number) for several years thereafter. Thus, in both his 1993 and 1996 telephone books Kaplan had Caracappa's beeper number; it was listed under the code name "Marco." And, as discussed below, Kaplan testified that in 1994-1996, he still considered himself a possible "future money earner for" Eppolito and Caracappa (Tr. 914-15). In sum, the jury was not required to find that the enterprise alleged in the Indictment was dependent on defendants' access to confidential law enforcement information or that the enterprise ended with defendants' retirements from NYPD.

Moreover, although the district court viewed Eppolito and Caracappa as providing services solely to members and associates

of the Lucchese Crime Family, the Indictment was not so limited; it alleged that the members and associates of the enterprise sought "[e]nrich[ment] . . . through assisting La Cosa Nostra ('LCN'), a nationwide criminal organization" (Indictment ¶ 4(a) (emphasis added)). Nor was defendants' offer of their services so limited. When Eppolito proposed that he and Caracappa be put on retainer, he said they would "give [Kaplan] everything that we get on every family." (Tr. 620 (emphasis added).) And indeed, although Eppolito and Caracappa were being paid their $4,000-a-month retainer by Casso, and Casso insisted that in return they work only for him, Eppolito and Caracappa in fact provided information that was designed to and did assist all of the crime families. For example, Eppolito and Caracappa alerted Kaplan that there was a listening device in a restaurant owned and frequented by members of the Genovese Crime Family and that various members of the Genovese or Colombo families had become government informants. Kaplan testified that when information provided by Eppolito and Caracappa concerned someone from a crime family other than the Lucchese, "Casso would pass it to the different families. He'd pass some information to the Bonannos and he passed some information to the Genovese." (Tr. 442; see also id. at 665-66 (describing Casso's relaying such information to the Colombo Crime Family).)

In addition, there was evidence that Eppolito and Caracappa had previously worked with members of organized crime other than Kaplan and Casso. Santoro, who himself was loosely

affiliated with the Gambino Crime Family, indicated as much when he first approached Kaplan to offer the services of Eppolito and Caracappa, "assur[ing]" Kaplan that "[Santoro] had done things with [Eppolito and Caracappa] previously and that they were good stand-up guys" (Tr. 517). And Eppolito himself indicated that he had such a past history when he told Kaplan that he liked doing business with Kaplan and Casso, "because when [Eppolito] gave [Kaplan and Casso] information people got taken care of that deserved it, and that in the past he gave information to other people and they never acted on it." (Tr. 657.)

Further, in contrast to the district court's view that defendants' relocation to Las Vegas marked the end of the enterprise through which Eppolito and Caracappa sought to earn money by providing services to members and associates of organized crime, the jury could have found otherwise based on, inter alia, Kaplan's testimony in response to cross-examination by Caracappa's attorney:

> Q . . . [B]y the time you were in Las Vegas with Caracappa and Eppolito, you sure were not a future money earner for them.

> A I disagree with you there. There was never no break in the friendship. There was just a break in doing business with Casso.

> . . . .

> There could have been some possible earners. It's the same reason I went to Steve and tried to do the QVC deal. I had the connections. Steve knew that.

(Tr. 914-15 (emphases added).)

- 61 -

The jury could also have found that Eppolito continued to pursue the principal goal of the enterprise in Las Vegas by, inter alia, offering services in the nature of money laundering, i.e., accepting "investments" of money generated by criminal activities such as drug trafficking, and obscuring its source by returning to the "investors" money that would come from the sale of film scripts. Although the district court characterized the organized crime connection to Eppolito's Las Vegas film endeavors as "tangential[]," Eppolito I, 436 F.Supp.2d at 572-73, the jury was hardly required to adopt such a view. Eppolito told Corso that "the Gambino crime family had always offered him money for script[s] or for movies, . . . they always come to him and said Lou, I can give you money for this or that." (Tr. 1618; see also id. at 1624 ("Eppolito says: 'Listen to me, I got people from the Gambino family that call me all of the time[, saying,] You know, Louie, we got money, you know . . . .'").) Further, from the evidence viewed in the light most favorable to the government, it was clear that Eppolito had members of organized crime working to help him find others to invest in his film project. Corso was approached by members of two crime families seeking funding for Eppolito's film: first Dibari, a member of the Gambino family, and then John and Mike Frate, members of the Bonanno family; Eppolito had even given the Frates a copy of his script. John Frate was "to be a part of the whole process" "of funding the movie." (Tr. 1445.) And when Corso (who had been introduced as an associate of the heir-apparent to the Bonanno Crime Family)

- 62 -

told the Frates that he did not want to meet with Eppolito because Eppolito was a cop, "Mike Fr[ate] said that he understood [Corso's] concern" but that Corso "shouldn't worry" because "Lou was one of us . . . ." (Tr. 1565 (emphasis added)).

As discussed in Part II.C. above, a conspiracy does not end or divide into multiple conspiracies merely because there has been some change in membership or locale. Viewing the evidence as a whole, the jury was entitled to take into account the testimony that various information provided to Kaplan and Casso by Eppolito and Caracappa as NYPD detectives was given to all the New York area crime families; the testimony that Eppolito and Caracappa had provided services to other members of organized crime in the past; the testimony that Caracappa was given an opportunity in 1996 to earn money by arranging a meeting between QVC executives and one of Kaplan's "connections"; and the testimony and audio tapes indicating that in Las Vegas in 2004-2005, Eppolito sought to earn money from members of organized crime by offering a money-laundering service and indeed was inundated with requests for that service. This record did not permit the conclusion as a matter of law that the retirements of Eppolito and Caracappa and the imprisonment of Casso and Kaplan either put the Eppolito/Caracappa services-to-organized-crime enterprise out of business or put an end to the Eppolito/Caracappa conspiracy to conduct that enterprise through a pattern of racketeering activity.

We note that by redefining the enterprise strictly as one limited to the use by Eppolito and Caracappa of their positions as police detectives and the selling of confidential law enforcement information to Kaplan and Casso, the district court relieved Eppolito and Caracappa of their burden of showing that the RICO conspiracy alleged in the Indictment had come to an end or of showing withdrawal from the conspiracy. Given the evidence of the defendants' conduct in Las Vegas, including Eppolito's avidly seeking large sums of money from drug dealers and members of the Mafia for scripts he would agree to write, his manifest impatience in 2005 at the slow arrival of money from Corso's supposed Mafia drug dealer in Florida, and the ready response of Eppolito and Caracappa in 2005 to the request for narcotics to induce Corso's clients to provide money for Eppolito's film, the jury was easily entitled to find that neither Eppolito nor Caracappa had carried his burden of showing that he had withdrawn from the conspiracy or that the principal purpose of the enterprise as alleged in the Indictment, i.e., earning money through providing assistance to members and associates of organized crime, had been either accomplished or abandoned.

We also reject the district court's view that as a matter of law, because of the different types of racketeering activity, the enterprise that began in the 1980s and continued into the early 1990s could not be considered the same enterprise that engaged in the Las Vegas conduct that included Eppolito's mid-1990s monetary transactions involving proceeds from Kaplan's

- 64 -

narcotics trafficking business, Eppolito's 2004-2005 attempted money laundering of narcotics trafficking proceeds obtained through Corso, and Eppolito's and Caracappa's 2005 participation in narcotics distribution offenses. The district court reasoned that these mid-1990s and 2004-2005 acts were "sporadic" and "unconnected to the original" enterprise, Eppolito I, 436 F.Supp.2d at 572, in part because the court regarded the later acts of narcotics trafficking and laundering of the proceeds of narcotics trafficking as "type[s] of activity" that were "entirely different" from the racketeering acts performed in the 1980s and early 1990s, id. But the jury, which was accurately instructed that "the indictment allege[d] that the principal purpose of the enterprise was to generate money for its members and associates by means of various legal and illegal activities" (Tr. 3269 (emphasis added)), could have inferred from the evidence that the conduct in question was sufficiently similar in purpose, when viewed at the level of generality alleged in the Indictment, to show that the enterprise that began in New York continued to exist in Las Vegas.

For example, Kaplan testified that he had been involved in narcotics trafficking during the period in which Eppolito and Caracappa were working for Kaplan and Casso in New York, and that although Eppolito and Caracappa had not actually participated in that business, they had repeatedly offered to do so. The district court described those offers as proffers of "'law enforcement' services," Eppolito I, 436 F.Supp.2d at 572; but according to Kaplan's testimony, the offers were not so restricted. First,

Kaplan testified that Eppolito and Caracappa had offered to assist him in his narcotics trafficking business not only by surveilling his warehouses to make sure that he was not being investigated, which of course would have been a law-enforcement-related service, but also by following him when he went to meet associates. (See Tr. 783.) The jury was entitled to view the latter as an offer of protection services unrelated to defendants' official positions. Second, the offers to assist in Kaplan's narcotics trafficking business were not limited to those two types of service but were open-ended: Kaplan testified that Eppolito and Caracappa offered to "help me in any way"; they said, "any[ ]way that they could help me, they were willing to do it." (Id. (emphases added).)

Although Kaplan also testified that Eppolito and Caracappa offered these narcotics-trafficking-related services out of friendship and for free, and on its face such an offer might seem to be beyond the enterprise goal of earning money for such services, the jury was not required to view that offer in isolation and take it at face value. Rather, the jury could assess the offer of free services against the background of defendants' actions with respect to the first task that they performed for Casso, i.e., obtaining information as to who had made the attempt on Casso's life. Eppolito and Caracappa assembled that information, and Santoro delivered the packet to Kaplan stating that it was a gift and an act of friendship for which they would not accept payment. But when Casso asked for an address for and picture of Nicky Guido, who was mentioned in the

- 66 -

packet, Santoro, Eppolito, and Caracappa demanded payment of $4,000. The jury, assessing the evidence as a whole, rather than piecemeal, was entitled to view the offers by Eppolito and Caracappa of free services for Kaplan's marijuana business as, like the original "gift" to Casso, a loss-leader that would doubtless be followed by requests for payment for their services.

Finally, although the district court emphasized that Kaplan had rejected defendants' offers to assist in his narcotics trafficking business, the facts that Eppolito and Caracappa did not actually participate in that business and that Kaplan viewed that business as unrelated to his other activities with Casso, were not material here. Count One charged Eppolito and Caracappa not with the substantive crime of conducting the enterprise that provided services to members of organized crime but rather with conspiring to do so; it was permissible for the jury to find that precisely such a conspiracy was reflected in their open-ended offer of assistance to Kaplan for his narcotics trafficking operation.

In sum, we conclude that given the level of generality at which the Indictment alleged the principal purpose of the RICO enterprise, the evidence, viewed as a whole and in the light most favorable to the government, does not permit a conclusion that the enterprise ceased to exist prior to March 9, 2000, as a matter of law.

## F. Evidence of a RICO Pattern

As indicated in Part II.D. above, the government was required to prove not only the existence of the enterprise, but also agreement to participate in a "pattern of racketeering activity." To show such a pattern, the government was required to "show that the racketeering predicates [we]re related, and that they amount[ed] to or pose[d] a threat of continued criminal activity." H.J. Inc., 492 U.S. at 239 (emphasis omitted). To prove relatedness, the government may show either that the individual predicate acts were directly related to each other or that they were related to the enterprise in a way that made them "indirectly connected to each other." United States v. Locascio, 6 F.3d 924, 943 (2d Cir. 1993) (emphasis in original), cert. denied, 511 U.S. 1070 (1994); see, e.g., United States v. Indelicato, 865 F.2d 1370, 1383 (2d Cir.) (en banc) ("two racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise"), cert. denied, 491 U.S. 907 (1989).

The H.J. Inc. Court inferred that Congress intended that the relatedness of RICO predicate acts could be shown by proof that they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 492 U.S. at 240 (internal quotation marks omitted) (emphases added). Thus, "the concept of a pattern of racketeering activity . . . is broad indeed": the list of

specific possible similarities is illustrative rather than definitive; the examples are stated in the disjunctive; and the residual clause--"otherwise . . . interrelated by distinguishing characteristics"--is open to "a range of different ordering principles." Id. at 237, 238. As the H.J. Inc. Court said, "[t]here is no obviously 'correct' level of generality for courts to use in describing the criminal activity alleged in RICO litigation." Id. at 241 n.3.

Variations in the types of acts performed could of course persuade a factfinder that the racketeering acts are not related. But where there are other similarities, such as in participants or purpose, variations in the nature of the racketeering acts do not mean that there is no RICO pattern as a matter of law. As the Seventh Circuit noted in United States v. Masters, 924 F.2d 1362 (7th Cir.), cert. denied, 500 U.S. 919 (1991), "[a] criminal enterprise is more, not less, dangerous if it is versatile, flexible, diverse in its objectives and capabilities. Versatility, flexibility, and diversity are not inconsistent with pattern." Id. at 1367. Where the government presents evidence from which it could permissibly be inferred that the criminal acts have some rational common denominator or fit into a particular order or arrangement, the question of whether the acts are related is one of fact for the jury.

In the present case, the evidence was ample to allow the jury to find that the persons offering or performing the racketeering acts always included Eppolito and usually included

both Eppolito and Caracappa; that the recipients of these services were members or associates of organized crime; and that the principal purpose of the enterprise was to earn money for Eppolito and Caracappa through providing those services. Although the nature of the services that were performed or attempted varied widely, that was simply because a broad array was offered. For example, the very first proffer to Kaplan of the services of Eppolito and Caracappa was (a) for the furnishing of confidential law enforcement information, and (b) for the commission of murders. (See Tr. 426-27, 515-16.) Plainly, these two are disparate types of services. In addition, as discussed in the preceding section, Eppolito and Caracappa repeatedly offered to provide Kaplan with, inter alia, security services for his narcotics trafficking business--i.e., yet a third type of assistance--and they offered to help him in that business in "any[ ]way that they could" (Tr. 783), a broad offer indeed. The jury was entitled to view the offers of Eppolito and Caracappa to provide assistance to members and associates of organized crime as general and open-ended--as was alleged in the Indictment--and thus as encompassing defendants' conduct in Las Vegas, which included Eppolito's offers and attempts to launder the proceeds of narcotics trafficking and other organized crime activities, and Eppolito's and Caracappa's involvement in narcotics trafficking in order to induce would-be investors to give them money for a film in whose funding members of organized crime were integrally involved.

- 70 -

The district court's narrow focus on the agreement of Eppolito and Caracappa to provide confidential law enforcement information as the be-all and end-all of the enterprise and of the conspiratorial agreement was thus inconsistent with the allegations of the Indictment and disregarded or discounted the above evidence. The weighing of the evidence, however, was within the province of the jury as finder of fact. Where a given partnership has offered a variety of services to a defined category of customers, it is not entitled to a ruling that as a matter of law its services do not constitute a pattern simply because the offered services were varied.

Finally, as to the need to prove continuity or the threat of continuity, the H.J. Inc. Court noted that the government may meet that burden "in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity." 492 U.S. at 241 (emphasis added). The Court also noted, however, that proof of continuity and relatedness "will often overlap," id. at 239, and that "the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes," id. at 242-43 (emphasis added). Plainly, the evidence described above was sufficient to permit the jury to find that Eppolito and Caracappa operated as part of just such an association. The fact that there was a gap of some eight years between proven racketeering acts did not as a matter of law preclude a finding of pattern or continuity, for Congress

expressly defined pattern to include two or more acts of racketeering activity within a period (excluding any period of imprisonment) of 10 years. See 18 U.S.C. § 1961(5).

In sum, we conclude that Eppolito and Caracappa were not entitled to acquittal on the RICO conspiracy count on the theory that either their "services" enterprise or their conspiracy to conduct that enterprise through a pattern of racketeering activity had ended before March 9, 2000.

CONCLUSION

We have considered all of the arguments of Eppolito and Caracappa in opposition to the government's appeal and, for the reasons stated above, have found them to be without merit. The judgments of acquittal ordered by the district court are reversed, and the matter is remanded for reinstatement of the jury's verdicts and the imposition of sentences.