09-1177, 09-3115
USA v. Caracappa

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2009

(Argued: May 18, 2010          Decided: July 23, 2010)

Docket Nos. 09-1177-cr, -3115-cr

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

STEPHEN CARACAPPA, LOUIS EPPOLITO,

Defendants-Appellants.

_____

Before: KEARSE, SACK, and WESLEY, Circuit Judges.

Appeals from judgments of the United States District Court for the Eastern District of New York, Jack B. Weinstein, Judge, convicting defendants of racketeering conspiracy, see 18 U.S.C. § 1962(d), and narcotics distribution and conspiracy, see 21 U.S.C. §§ 841(a)(1) and 846, and convicting defendant Eppolito of money laundering, see 18 U.S.C. § 1956(a)(3)(B).

Affirmed.

STEPHEN E. FRANK, EVAN M. NORRIS, Assistant United States Attorneys, Brooklyn, New York (Benton J. Campbell, United States Attorney for the Eastern District of New York, David C. James, John David Buretta, Assistant United States Attorneys, Brooklyn, New York, on the brief), for Appellee.

DANIEL NOBEL, New York, New York, <u>for Defendant-Appellant Caracappa</u>.

JOSEPH A. BONDY, New York, New York, <u>for Defendant-Appellant Eppolito</u>.

KEARSE, <u>Circuit Judge</u>:

Defendants Stephen Caracappa and Louis Eppolito appeal from final judgments entered in the United States District Court for the Eastern District of New York after a jury trial before Jack B. Weinstein, <u>Judge</u>, convicting both defendants of racketeering conspiracy, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), and distribution of and conspiracy to distribute narcotics, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and convicting Eppolito of money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B). In finding Caracappa and Eppolito guilty of RICO conspiracy, the jury found that they had committed numerous predicate acts of racketeering activity, including many direct, accessorial, or conspiratorial acts of murder, kidnaping, and tampering with or retaliating against witnesses. Caracappa was sentenced principally to imprisonment for life plus 80 years; Eppolito was sentenced principally to imprisonment for life plus 100 years. On appeal, Caracappa contends principally that he was deprived of a fair trial because of the admission of evidence of an out-of-court statement by the government's key witness and because of improper remarks by the government in summation; he

- 2 -

also challenges, <u>inter alia</u>, the sufficiency of the evidence to support his convictions on the narcotics counts, and he contends that the sentence imposed on him on those counts is excessive. Eppolito contends principally that he was denied effective assistance of counsel by reason of his attorney's failures to communicate with him, to investigate and call favorable witnesses, and to inform him of his right to testify at trial. Finding no merit in defendants' contentions, we affirm the judgments of conviction.

## I. BACKGROUND

This matter was previously before this Court in <u>United States v. Eppolito</u>, 543 F.3d 25 (2d Cir. 2008) ("<u>Eppolito II</u>"), <u>rev'g in part</u> 436 F.Supp.2d 532 (E.D.N.Y. 2006) ("<u>Eppolito I</u>"), <u>cert. denied</u>, 129 S. Ct. 1027 (2009), in which we reversed the district court's statute-of-limitations-based dismissal of defendants' racketeering conspiracy convictions. The events leading to the prosecution are recounted in detail in <u>Eppolito II</u>, familiarity with which is assumed. We summarize below, in the light most favorable to the government and in accordance with the jury's verdicts, the evidence most pertinent to the present appeals.

A.  The Mafia Cops

Caracappa and Eppolito are former police detectives who were employed by the New York City Police Department ("NYPD") until the early 1990s. In 1986-1993, while so employed, they were also a partnership employed by Anthony Casso, the underboss, i.e., second in command, of the Lucchese Crime Family--one of the five Organized Crime Families in the New York City area. The government's key witness at trial was Burton Kaplan, who was a former associate of the Lucchese Crime Family, a close friend of Casso, and the main intermediary between Casso and Caracappa/Eppolito. Kaplan testified to the following events.

Caracappa/Eppolito had gained the trust of Kaplan in early 1986 by helping to commit a murder for him. Kaplan suspected that Israel Greenwald, a collaborator in one of Kaplan's own criminal schemes, was about to become an informant. Caracappa/Eppolito determined Greenwald's whereabouts, followed him on a highway, and used flashing lights to cause him to pull over; telling Greenwald they needed to take him to the police station for a lineup in a hit-and-run case, they instead took him to another location where he was shot and killed. For their efforts, Caracappa and Eppolito were paid more than $16,000.

In mid-1986, there was an unsuccessful attempt on the life of Casso in NYPD's 63rd Precinct. Eppolito was assigned to that Precinct, and Caracappa was a member of a task force whose members included local detectives and agents of the Federal Bureau of Investigation. Kaplan recommended Caracappa and Eppolito--without

disclosing their names--to Casso as a possible source of information on Casso's attackers. (Casso learned defendants' names in 1992, when Eppolito published his autobiography entitled Mafia Cop and included pictures of himself and Caracappa.) In response to the ensuing request, Caracappa/Eppolito gave Kaplan a packet of police reports that included a photograph of Jimmy Hydell, an associate of the Gambino Crime Family, and the information that Hydell was one of the men involved in the attempt on Casso's life. After Kaplan described the methods Caracappa/Eppolito had used with Greenwald, Casso hired Caracappa and Eppolito to kidnap Hydell. Caracappa and Eppolito themselves were not to kill Hydell, however, but only to deliver him to Casso so that Casso could extract information from him and then kill him. The Hydell mission was successfully completed, and Caracappa/Eppolito were paid nearly $24,000. Thereafter, at Eppolito's request, Casso placed Caracappa/Eppolito on retainer at the rate of $4,000 per month in exchange for their using their law-enforcement positions to collect all the information they could about investigations on any of the five Organized Crime Families, including the identities of informants, the locations of wiretaps, and any imminent arrests, and passing that information to Kaplan for Casso. Caracappa and Eppolito were to be paid extra for "murder contracts." One such contract--earning Caracappa/Eppolito $70,000--was for the 1990 murder of Edward "Eddie" Lino, whom Hydell had identified in 1986 as one of the

three Gambino Crime Family members who ordered the attempt on Casso's life.

The retainer agreement required Caracappa and Eppolito to work exclusively for Casso and not deal with members of other crime families. When Caracappa/Eppolito had information about other families, they gave it to Kaplan, who passed it on to Casso. Casso relayed the information to those families.

When Caracappa/Eppolito informed Kaplan of persons giving, or believed to be giving, information to law enforcement authorities about Casso or the Lucchese Family, Casso had the informants killed. For example, soon after Caracappa and Eppolito were placed on retainer, Casso asked Kaplan to have them find out whether John "Otto" Heidel, a Lucchese Crime Family associate, was cooperating with the authorities. Caracappa/Eppolito determined that Heidel was cooperating and they passed that information to Casso through Kaplan. Casso had Heidel killed. Heidel had in fact been cooperating with the authorities, secretly recording incriminating conversations. Eppolito, while officially and ostensibly investigating Heidel's murder, removed the incriminating audio tapes from Heidel's apartment and gave them to Kaplan to give to Casso.

Casso similarly suspected Lucchese Crime Family member Anthony Dilapi, who was on parole, of having become a government informant. Casso summoned Dilapi to a meeting, but Dilapi instead fled New York. Casso had Kaplan ask Caracappa to determine Dilapi's whereabouts. Caracappa, through Dilapi's parole officer,

located Dilapi in California. Casso had him killed. On another occasion, Eppolito informed Kaplan of an impending indictment in which Lucchese Crime Family capo Bruno Facciola would be named as an unindicted coconspirator rather than a defendant, leading Eppolito to infer that Facciola was a government cooperator. Casso had Facciola killed. Kaplan testified that Eppolito said he liked doing business with Kaplan and Casso because when Eppolito provided Casso with information, "people got taken care of that deserved it . . . ." Eppolito II, 543 F.3d at 31 (internal quotation marks omitted).

In May 1990, Caracappa/Eppolito informed Kaplan that Casso and Lucchese Crime Family boss Victor Amuso, among others, were about to be arrested. Kaplan alerted Amuso, who alerted Casso; by the next day, both Amuso and Casso had fled. While Casso was a fugitive, he maintained contact with Kaplan, who continued to relay to him sensitive law enforcement information received from Caracappa/Eppolito and to deliver $4,000 a month from Casso to Caracappa/Eppolito. Eppolito retired from NYPD in early 1990, and Caracappa retired from NYPD in 1992; they remained on retainer until Caracappa retired.

After retiring from NYPD, Eppolito moved to Las Vegas, where he started a business writing screenplays; Caracappa, who also eventually moved to Las Vegas, was a vice president of Eppolito's film company. In that business, Eppolito would agree to write a screenplay for anyone--including members of organized crime or drug dealers--who gave him $75,000 in cash; and Eppolito

would send the investor 50 percent of whatever amount was received from the screenplay's sale. See Eppolito II, 543 F.3d at 36-39, 43-44. Eppolito told Stephen Corso, a government informant, that many such investments were made by members of the Gambino Crime Family. See, e.g., id. at 54.

Corso had been assisting in a lengthy government investigation in Las Vegas that did not initially involve Caracappa or Eppolito. In the Fall of 2004, however, members of the Gambino Crime Family and the Bonanno Crime Family were attempting to raise money for the actual production of a movie written by Eppolito, and they urged Corso to meet Eppolito and to persuade Corso's supposed clients to invest in the movie. Corso--as instructed by his government handlers--at first refused to see Eppolito, stating that Eppolito was a cop; Corso was thereafter instructed to agree to meet with Eppolito, having been assured by one of the Bonanno Crime Family members that "Lou was one of us," id. at 37 (internal quotation marks omitted).

Eppolito told Corso that $5 million would be needed to produce his movie, more than was available from crime family members. See, e.g., id. at 38. Corso thereafter had numerous meetings with Eppolito and/or Caracappa with respect to other possibilities for funding the movie. Caracappa and Eppolito were arrested in March 2005, after Corso had, for several months, tape-recorded their conversations, see, e.g., id. at 37-39, including an attempt by Caracappa and Eppolito to secure other investors by supplying them with controlled substances, see Part II.C.2. below.

B.   The Flight, Return, Arrest, and Cooperation of Kaplan

In the meantime, in 1993, Casso was arrested.  In March 1994, Judd Burstein, Kaplan's attorney, telephoned Kaplan to alert him that Casso had probably begun to cooperate with the government.  Within hours, Kaplan left New York and went into hiding.  In that month there were articles in New York City newspapers stating that Casso had two law-enforcement officers on his payroll.  At least one article identified the officers as Caracappa and Eppolito.  Shortly after reading these articles, Kaplan told Burstein that he, Kaplan, had been the intermediary between Casso and Caracappa/Eppolito.

In 1996, after learning that Casso would not be used as a government witness after all, Kaplan returned to New York.  He was soon arrested and charged with narcotics offenses, having conducted a flourishing drug trafficking business for many years (in his best year, distributing more than six tons of marijuana and earning some $2 million).  Kaplan resisted repeated government attempts to gain his cooperation, and he proceeded to trial.  He was convicted of conspiracy to distribute marijuana and was sentenced principally to a prison term of 27 years.

In the Fall of 2004, by then over 70 years of age and having spent the previous nine years in jail, Kaplan decided to cooperate with the government in the prosecution of Caracappa and Eppolito.  Principally on the basis of the testimony of Kaplan and Corso, Caracappa and Eppolito were convicted of RICO conspiracy,

in violation of 18 U.S.C. § 1962(d).  In connection with their activities in Las Vegas after retiring from NYPD, Caracappa and Eppolito were also convicted, largely on the basis of the testimony of Corso, of distributing narcotics in violation of 21 U.S.C. § 841(a)(1), and conspiring to do so in violation of 21 U.S.C. § 846; and Eppolito was convicted of money laundering in violation of 18 U.S.C. § 1956(a)(3)(B).

## II.  CARACAPPA

On this appeal, Caracappa contends principally that the trial court erred in allowing Burstein to testify to Kaplan's 1994 statement that Kaplan had been the intermediary between Casso and Caracappa/Eppolito; that statements by the government in summation improperly bolstered Burstein's testimony; and that the government in summation improperly introduced consideration of religion. Caracappa also contends that the government's cross-examination of one of his witnesses was improper, that the evidence was insufficient to support his convictions on the narcotics counts, and that his sentence on those counts is unreasonable.  We find no basis for reversal.

A.  The Admissibility of Kaplan's 1994 Statement

After Kaplan had testified and described relaying information received from Caracappa and Eppolito to Casso and relaying to them instructions and payments from Casso, and after

defendants had cross-examined Kaplan at length, challenging the veracity of that testimony, the government was allowed to call Burstein as a witness to testify that Kaplan told him in 1994 that Kaplan had been the conduit between Caracappa/Eppolito and Casso. Caracappa contends principally that the Burstein testimony was inadmissible hearsay and that, in any event, it should have been excluded because defendants had not received advance notice of the 1994 statement by Kaplan and thus could not cross-examine Kaplan with respect to that statement. These contentions have no merit.

The Federal Rules of Evidence specify the circumstances in which a prior statement by a witness is to be considered nonhearsay. Rule 801(d) provides, in pertinent part, that "[a] statement is <u>not</u> hearsay <u>if</u> . . . . <u>[t]he declarant</u> testifies at the trial or hearing and <u>is subject to cross-examination concerning the statement</u>, <u>and the statement is</u> . . . consistent with the declarant's testimony and is <u>offered to rebut an express or implied charge against the declarant of</u> recent fabrication or <u>improper influence or motive</u> . . . ." Fed. R. Evid. 801(d)(1)(B) (emphases added). In addition to these stated preconditions, there is "imbedded in the Rule" a temporal limitation that "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive." <u>Tome v. United States</u>, 513 U.S. 150, 159, 167 (1995); <u>see</u>, <u>e.g.</u>, <u>United States v. Al-Moayad</u>, 545 F.3d 139, 167 (2d Cir.

- 11 -

2008); United States v. Forrester, 60 F.3d 52, 64 (2d Cir. 1995); United States v. Quinto, 582 F.2d 224, 232-33 (2d Cir. 1978).

To come within Rule 801(d)(1)(B), the prior consistent statement need not be proffered through the testimony of the declarant but may be proffered through any witness who has first-hand knowledge of the statement. See, e.g., United States v. McGrath, 558 F.2d 1102, 1107 (2d Cir. 1977), cert. denied, 434 U.S. 1064 (1978); 30B M. Graham, Federal Practice & Procedure § 7012, at 162 (Interim ed. 2006) ("Graham"). Further, where the declarant has already testified and the prior consistent statement is proffered through the testimony of another witness, the Rule's "subject to cross-examination" requirement is satisfied if the opposing party is not denied the opportunity to recall the declarant to the stand for cross-examination concerning the statement. See, e.g., United States v. Piva, 870 F.2d 753, 758 (1st Cir. 1989); Graham § 7012, at 162-63.

We review the district court's decision to admit a statement into evidence under Rule 801(d)(1)(B) for abuse of discretion. See United States v. Burden, 600 F.3d 204, 229 (2d Cir. 2010), petition for cert. filed, No. 10-5153 (U.S. June 29, 2010); United States v. McGrath, 558 F.2d at 1107. We see no abuse of discretion here.

At trial, much of the cross-examination conducted by defendants was directed toward their statute-of-limitations defense, which asserted that after Caracappa and Eppolito retired from NYPD and moved to Las Vegas, their RICO conspiracy with

Kaplan ended, and that the present prosecution for their activities in New York was untimely. But defendants also aggressively challenged the truth of Kaplan's testimony as to the criminal activities of Caracappa and Eppolito while they were NYPD detectives, questioning him at length about his cooperation agreement with the government and his anticipated gain from testifying against Caracappa and Eppolito, and repeatedly asking whether his testimony wasn't being given in the hope that the government would appreciate his assistance and would move to reduce his sentence. The district court found that defendants "ha[d] insinuated, directly and indirectly during the opening and during the cross-examination that [Kaplan's] motive to lie arose from his desire to be released from prison" (Tr. 1218), and it construed that line of questioning as a charge that Kaplan's testimony was being given for an improper motive (see id. at 1213-16).

Although defendants contended that the temporal aspect of Rule 801(d)(1)(B) was not satisfied, arguing that Kaplan had a motive to fabricate from the moment he learned that Casso had been arrested, the district court rejected that contention. Pointing out that "Kaplan was not in prison in 1994 when Casso attempted to cooperate" (id. at 1218), the court stated that

> [f]or [defendants'] theory to hold, Kaplan must have believed in 1994 that he [Kaplan] would eventually cooperate with the government, hoping that his testimony against the defendants would be called into question and knowing that if he told Mr. Burstein of his involvement, his account would have increased merit.

> That sequence of events, which is farfetched on it[]s face, is undercut by what actually happened in 1994 when Casso cooperated. Far from running to the government to cooperate, Kaplan went on the lam for approximately two years, returning only after he learned that Casso could not be used as a government witness

(<u>id</u>. at 1217-18). The court ruled that the preconditions of Rule 801(d)(1)(B) were satisfied and that Burstein would be allowed to testify to Kaplan's 1994 statement. (<u>See</u> <u>id</u>. at 1216-17; <u>see also</u> <u>id</u>. at 1208, 1218 (not allowing Burstein to testify to a 1996 statement Kaplan made to him after being arrested).) In response to defendants' complaint that, had they known of the 1994 statement in advance they could have cross-examined Kaplan on that statement, the court stated, "You can recall him if you like." (<u>Id</u>. at 1213.)

Having reviewed the record, we see no error in the district court's findings that defendants had expressly or impliedly suggested that Kaplan's testimony was fabricated because of his desire to get out of prison. Nor do we see any error in the court's finding that Kaplan's 1994 statement to Burstein, made while Kaplan was on the lam and some two years before he was arrested, was made before Kaplan had a motive to fabricate.

The record also amply shows that defendants could have cross-examined Kaplan on that statement. First, the court expressly stated that it would allow them to recall Kaplan as a witness. Second, the record shows that the "3500 material" produced to defendants prior to Kaplan's cross-examination, <u>see</u> 18 U.S.C. § 3500; Fed. R. Crim. P. 26.2, included an investigative

report stating that Burstein, Kaplan's attorney, told Kaplan in March 1994 that Casso had become a government witness, and that thereafter, "after a newspaper article appeared naming EPPOLITO and CARACAPPA as the two hit men in the Eddie LINO homicide, KAPLAN told his attorney, in sum and substance that he had been the intermediary between EPPOLITO, CARACAPPA and CASSO" (Government Exhibit 3500-BK-21 at 108-09). Thus, defendants had in fact been informed of Kaplan's 1994 statement prior to trial and could have cross-examined Kaplan on it before Burstein testified.

Finally, although Caracappa also contends that the government in summation improperly used Burstein's testimony to bolster that of Kaplan, rather than using it solely to counter the suggestion that Kaplan's testimony was motivated by an improper purpose, we see no misuse by the government. Prior consistent statements that are admissible under Rule 801(d)(1)(B) "are substantive evidence. The prior statement is consistent with the testimony given on the stand, and, if the opposite party wishes to open the door for its admission in evidence, no sound reason is apparent why it should not be received generally." Fed. R. Evid. 801 Advisory Committee Note (1972); see, e.g., United States v. Brennan, 798 F.2d 581, 587 (2d Cir. 1986) ("Statements admitted under Rule 801(d) are not hearsay and therefore are admissible as substantive evidence.").

B.   The Challenges to the Government's Rebuttal Summation

In the government's rebuttal summation, the Assistant United States Attorney ("AUSA") made statements about Kaplan's 1994 statement to Burstein, to which Caracappa takes exception on appeal.  The AUSA stated, inter alia, "I submit to you that based on the circumstances of the case and the circumstances of what Mr. Kaplan told him, you can completely trust everything [Burstein] said 100 percent, 100 percent" (Tr. 3227), and Burstein "told you the truth.  He is an officer of the court" (id. at 3230).  Caracappa contends that the government thereby improperly vouched for Burstein's veracity.  In addition, the AUSA pointed out that all major religions such as Islam, Judaism, and Catholicism have rites of penitence; he analogized the attorney-client privilege to the priest-penitent privilege and argued that it would make no greater sense for Kaplan to have told Burstein, his attorney, falsely, that he had committed a crime than it would for persons practicing Catholicism, seeking forgiveness through the intermediary between themselves and their God, to "admit[] something they didn't do."  (Id.)  Caracappa seeks a new trial on the ground that this constituted "vouching for Burstein's credibility by using Burstein's testimony to bolster Kaplan's credibility through an appeal to religious faith."  (Caracappa brief on appeal at 39 (emphasis omitted).)

A defendant bears a substantial burden in arguing for reversal on the basis of prosecutorial misconduct in the summation.  See, e.g., United States v. Young, 470 U.S. 1, 11-12

- 16 -

(1985); United States v. Millar, 79 F.3d 338, 343 (2d Cir. 1996). In determining whether an inappropriate remark amounts to prejudicial error, we look to "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." United States v. Spinelli, 551 F.3d 159, 170 (2d Cir. 2008), cert. denied, 130 S.Ct. 230 (2009). Flaws in the government's summation will require a new trial only in the rare case in which improper statements--viewed against the entire argument to the jury--can be said to have deprived the defendant of a fair trial. See United States v. Forlorma, 94 F.3d 91, 93-94 (2d Cir. 1996); United States v. Millar, 79 F.3d at 343; United States v. Rodriguez, 968 F.2d 130, 142 (2d Cir.), cert. denied, 506 U.S. 847 (1992).

Further, in the absence of an objection at trial, a claim of improper vouching is reviewable only for plain error. See, e.g., United States v. Rodriguez, 587 F.3d 573, 583 (2d Cir. 2009); Fed. R. Crim. P. 52(b). Under the standard set by United States v. Olano, 507 U.S. 725 (1993), for applying Rule 52(b), "before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" Johnson v. United States, 520 U.S. 461, 466-67 (1997) (quoting Olano, 507 U.S. at 732). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error '"seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."'" Johnson, 520 U.S. at 467

(quoting Olano, 507 U.S. at 732 (which was quoting United States v. Young, 470 U.S. at 15 (other internal quotation marks omitted))).

In the present case, although Caracappa's counsel and Eppolito's counsel, respectively, objected to other aspects of the government's rebuttal summation, neither of them objected to the statements described above or sought any cautionary instruction to the jury, and we cannot see that any of these statements warrants a new trial. The AUSA's statement that the jury could trust Burstein 100 percent "based on the circumstances of the case and based on the circumstances of what Mr. Kaplan told him" does not constitute vouching; it is merely an argument that the evidence indicates that Burstein's testimony was completely truthful and accurate. Nor can we agree with Caracappa's contention that the analogy drawn between the attorney-client privilege and the priest-penitent privilege was in any sense an appeal to religion; rather, it was plainly an argument that, in seeking aid from an advisor, it makes no sense to claim guilt falsely. The statement that Burstein should be believed because he "is an officer of the court" may have been improper either as a suggestion that Burstein should be viewed as something other than a witness for the prosecution or as a suggestion that attorneys always tell the truth; but that isolated statement, even if improper, clearly did not affect defendants' substantial rights. Accordingly, the plain-error test has not been met.

## C. Caracappa's Other Contentions

Caracappa also contends that the government's cross-examination of one of his witnesses was improper, that the evidence was insufficient to support his convictions on the narcotics counts, and that his sentence on those counts is unreasonable. These contentions do not warrant extended discussion.

### 1. The Witness Shanahan

Caracappa called as a defense witness his former NYPD partner Detective Leslie Shanahan to testify to their official duties stretching into the day Lino was shot and killed, apparently to permit the jury to infer that Caracappa, who had gone off duty at approximately 11:30 that morning in Manhattan, could not have been one of the men who shot and killed Lino in Brooklyn at approximately 7:00 that evening. On cross-examination, the government asked Shanahan numerous questions as to police procedures, his knowledge of Caracappa's personal life, and various driving times and distances. Caracappa complains that "no effort was made to confine the examination to the form appropriate for a direct examination." (Caracappa brief on appeal at 30.)

While the cross-examination of Shanahan was somewhat more far-ranging than the direct examination, the trial "court is 'accorded broad discretion in controlling the scope and extent of cross-examination.'" United States v. Wilkerson, 361 F.3d 717,

734 (2d Cir.) (quoting United States v. Fabian, 312 F.3d 550, 558 (2d Cir. 2002)), cert. denied, 543 U.S. 908 (2004). Although "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness," Fed. R. Evid. 611(b), "[t]he court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination," id. "It is, of course, unrealistic to expect that direct examination and cross-examination will be perfectly congruent. . . . The latter need only be reasonably related to the former, and matching the two requires the district court to make a series of judgment calls." Macaulay v. Anas, 321 F.3d 45, 53 (1st Cir. 2003). Most of the questioning on cross-examination was reasonably related to the questions put to Shanahan on direct, and we cannot conclude that the leeway granted by the trial court overall was an abuse of discretion.

2. Sufficiency of the Evidence on the Narcotics Counts

Caracappa contends that the evidence presented at trial was insufficient for the jury to find him guilty of distributing and conspiring to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. A defendant who makes such a challenge bears a heavy burden, since he must show that "no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt," United States v. Schwarz, 283 F.3d 76, 105 (2d Cir. 2002); see, e.g., United States v. Payne, 591 F.3d 46, 60 (2d Cir.), petition for cert. filed, No. 09-10015

- 20 -

(U.S. April 1, 2010), and since, in determining whether he has made that showing, we must view the evidence in the light most favorable to the government, drawing all permissible inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility, see, e.g., United States v. Sabhnani, 599 F.3d 215, 241 (2d Cir. 2010); United States v. Parkes, 497 F.3d 220, 225 (2d Cir. 2007), cert. denied, 552 U.S. 1220 (2008).

The government's evidence on the narcotics counts was presented principally through the testimony of Corso and was described in Eppolito II as follows:

> Corso testified that at a dinner with Eppolito and Caracappa in mid-February 2005, he told them he was expecting a visit from four Hollywood clients, each of whom was interested in investing $75,000 in Eppolito's film project, and that his clients wanted to purchase "'designer drugs'" (Tr. 1587), specifically ecstasy and crystal methamphetamine. Corso testified that Eppolito responded that "Tony," his son, could handle it; both Eppolito and Caracappa said that Guido Bravatti, a young associate of Caracappa's, could handle it. Later that night, Eppolito called Corso to give him Bravatti's telephone number.

> On the following evening, Corso had dinner with Tony and Bravatti. Corso told them that his clients wanted an ounce of crystal methamphetamine and six to eight ecstasy pills; Bravatti said there would be no problem. Tony and Bravatti indicated that they wanted to do all they could to facilitate investments by Corso's clients in Eppolito's film project.

> The next day, Tony and Bravatti made a partial delivery at Corso's office, saying that they had had some difficulty in obtaining what Corso requested. They handed him an envelope containing somewhat less than the requested ounce of crystal methamphetamine, and Corso paid them proportionately. The parties stipulated at trial that that envelope had contained 25.4 grams of 64-percent-pure methamphetamine.

- 21 -

543 F.3d at 38-39 (emphases added). This evidence was ample to permit the jury to find Caracappa guilty of conspiring to distribute, and distributing, a controlled substance.

3. The Prison Terms Imposed for the Narcotics Counts

For Caracappa's convictions of conspiring to distribute and distributing narcotics in violation of 21 U.S.C. §§ 846 and 841(a)(1), respectively, the district court sentenced Caracappa to, inter alia, consecutive prison terms of 40 years on each count, the maximum authorized by 21 U.S.C. § 841(b)(1)(B). Caracappa contends that the total, 80 years' imprisonment, is excessive and represents cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. Although these sentences are severe, on the record in the present case we find no basis for disturbing them.

"In the aftermath of United States v. Booker, we review sentences for reasonableness, . . . 'a deferential standard limited to identifying abuse of discretion regardless of whether a challenged sentence is inside, just outside, or significantly outside the Guidelines range.'" United States v. Jass, 569 F.3d 47, 65 (2d Cir. 2009) (quoting United States v. Jones, 531 F.3d 163, 170 (2d Cir. 2008) (other internal quotation marks omitted)), cert. denied, 130 S.Ct. 2128 (2010). Further, "[t]he Eighth Amendment forbids only extreme sentences that are grossly disproportionate to the crime," and in a noncapital case, it is "'exceedingly rare'" to uphold a claim that a sentence within the

statutory limits is disproportionately severe. United States v. Yousef, 327 F.3d 56, 163 (2d Cir. 2003) (quoting Rummel v. Estelle, 445 U.S. 263, 272 (1980) (other internal quotation marks omitted) (emphasis ours)); see also United States v. Olson, 450 F.3d 655, 686 (7th Cir. 2006) ("In non-capital felony convictions, a particular sentence that falls within legislatively prescribed limits will not be considered disproportionate unless the sentencing court abused its discretion."); United States v. Organek, 65 F.3d 60, 62 (6th Cir. 1995) ("a sentence within the statutory maximum set by statute generally does not constitute cruel and unusual punishment" (internal quotation marks omitted)).

In the present case, the district court explained the severe sentences imposed on Caracappa and Eppolito as follows:

> For many years, these two defendants, while members of the New York City Police Force, were employed by the mafia to murder, to reveal FBI and police files to criminals, to conduct surveillances as directed by mafia bosses, and to undertake other duties on behalf of mobsters. They were paid substantial retainers, with added amounts for the commission of specific criminal acts, including murders, collecting large sums of money over many years.
>
> Sentences are now imposed pursuant to the United States Sentencing Guidelines, relevant case law, and applicable statutes. See 18 U.S.C. § 3553(a); United States v. Eppolito, 543 F.3d 25 (2d Cir. 2008), cert. denied, 129 S.Ct. 1027 (2009).
>
> The critical elements of the applicable statute in this case are general deterrence to discourage similar acts by others, and just punishment. See 18 U.S.C. § 3553(a)(2)(A)-(B). On June 5, 2006, the "nature and circumstances of the offense and the history and characteristics of the defendant" pursuant to 18 U.S.C. § 3553(a)(1) were described as follows by the court:

- 23 -

> It is hard to visualize any more heinous offenses. . . . A heavy sentence is required to promote respect for the law, to provide just punishment for the offenses . . . and to deter like conduct by any person who might be in the position of these defendants. It is necessary to deter their own criminal conduct as revealed by the circumstances of the events as late as 2005 and 2006 [when, as the Court of Appeals has now found, they continued to conspire to commit crimes with criminal mobsters].
>
> It is necessary under the statute to protect the public from further crimes of these defendants. A non-incarceratory sentence would not be appropriate.

Hr'g Tr. 40-41, June 5, 2006.

> In addition to committing cruel murders and engaging in a dangerous racketeering conspiracy in violation of section 1962(d) of Title 18 of the United States Code ("RICO"), these two defendants have committed what amounts to treason against the people of the City of New York and their fellow police officers.
>
> They are sentenced to the maximum sentence of imprisonment and to the maximum fine for each crime of which they have been convicted, imposed consecutively.

Judgment dated March 6, 2009, at 1-2 (alterations in original) (emphasis added).

Although Caracappa contends that the district court's explanation of its reasons for the sentence, quoted in part in the Judgment, was inadequate to support the sentence imposed, he voiced no such objection in the district court. Thus, his present objection is reviewable only for plain error. See, e.g., United States v. Villafuerte, 502 F.3d 204, 208 (2d Cir. 2007). We see no such error, and no prejudicial effect on Caracappa's substantial rights.

- 24 -

While Caracappa argues that the transaction reflected in the record was a small one and that "there is no reason to believe that Mr. Caracappa had solicited, wanted or even anticipated that Steven [sic] Corso would propose a drug transaction as a condition precedent for what was represented to be a legal negotiation coming to fruition" (Caracappa brief on appeal at 54), the evidence as to that transaction, quoted in Part II.C.2 above, reveals that Caracappa unhesitatingly agreed to have his associate supply drugs as requested by Corso. Further, as the district court noted, the activities of Caracappa and Eppolito in Las Vegas were a continuation of their business of providing illicit services. As noted in Eppolito II,

> [t]he jury was entitled to view the offers of Eppolito and Caracappa to provide assistance to members and associates of organized crime as general and open-ended . . . and thus as encompassing defendants' conduct in Las Vegas, which included Eppolito's offers and attempts to launder the proceeds of narcotics trafficking and other organized crime activities, and Eppolito's and Caracappa's involvement in narcotics trafficking in order to induce would-be investors to give them money for a film in whose funding members of organized crime were integrally involved.

543 F.3d at 58. It was within the discretion of the district court to view Caracappa's narcotics trafficking as an integral part of his and Eppolito's criminal activity, rather than in isolation, and to impose the maximum punishment authorized by law.

## III. EPPOLITO

Eppolito, on this appeal, contends principally that he did not receive constitutionally effective assistance of counsel. He argues that his attorney Bruce Cutler did not communicate with him adequately; failed to investigate, call favorable witnesses, or introduce and marshal evidence; and failed to inform him of his right to testify. We are unpersuaded.

A defendant claiming ineffective assistance of counsel must meet both prongs of the standard set by Strickland v. Washington, 466 U.S. 668 (1984), by (1) demonstrating that his attorney's performance "fell below an objective standard of reasonableness" in light of "prevailing professional norms," Strickland, 466 U.S. at 688, and (2) "affirmatively prove prejudice" arising from counsel's allegedly deficient representation, id. at 693; see, e.g., United States v. Cohen, 427 F.3d 164, 167 (2d Cir. 2005). "In applying this standard, a reviewing court must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound [legal] strategy.'" United States v. Gaskin, 364 F.3d 438, 468 (2d Cir. 2004) (quoting Strickland, 466 U.S. at 689), cert. denied, 544 U.S. 990 (2005). And to demonstrate prejudice, "the defendant must show that . . . 'there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding below would have been different.'" Puglisi v. United States, 586 F.3d 209, 215 (2d Cir. 2009) (quoting Strickland, 466 U.S. at 694).

In the present case, following the jury's verdicts, both Caracappa and Eppolito moved for a new trial based on claims, inter alia, that their respective attorneys had failed to render constitutionally effective assistance. The district court held a three-day evidentiary hearing into defendants' contentions and rejected their claims in Eppolito I, 436 F.Supp.2d at 561-65. That decision was not at issue in Eppolito II.

Insofar as Eppolito contended that Cutler did not adequately communicate with him, the district court rejected that claim without discussion, see Eppolito I, 436 F.Supp.2d at 564; its rejection is supported by the record. Cutler testified that he had an "open line of communication" with Eppolito (Hearing Transcript, June 26, 2006, at 388) and spoke with him every morning of the trial (id.). Edward Hayes, Caracappa's counsel, testified that Cutler met with Eppolito on a regular basis during the trial. (Id. at 446.) In addition, Bettina Schein, Cutler's co-counsel, testified, inter alia, that Eppolito had been pleased with Cutler's performance and made no complaints until the verdict was returned. (Id. at 477-78.) The record thus supports the district court's rejection of Eppolito's lack-of-communication claim.

Eppolito's other contentions were expressly rejected by the district court following the hearing. With respect to the

- 27 -

claim of failure to investigate, to call favorable witnesses, or to introduce and marshal evidence, the court described the pertinent legal principles, in relevant part, as follows:

> "The duty to investigate is essential to the adversarial testing process 'because the testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies.'" Greiner v. Wells, 417 F.3d 305, 320 (2d Cir.2005) (quoting Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)). This duty requires defense counsel either "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. 2052; see also Williams v. Taylor, 529 U.S. 362, 395-96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); Lindstadt v. Keane, 239 F.3d 191, 200 (2d Cir.2001). It does not, however, compel counsel to conduct a comprehensive investigation of every possible lead or defense, see, e.g., Strickland, 466 U.S. at 699, 104 S.Ct. 2052; Wells, 417 F.3d at 321, or "to scour the globe on the off-chance something will turn up." Rompilla v. Beard, 545 U.S. 374, ----, 125 S.Ct. 2456, 2463, 162 L.Ed.2d 360 (2005). "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." Id.

Eppolito I, 436 F.Supp.2d at 562. The court found that this standard had not been met:

> The performance of both attorneys was far from constitutionally ineffective. Counsel were assisted by excellent investigators who, with the help of both defendants and Caracappa's brother, Domenick Caracappa, thoroughly investigated the case, studying vast amounts of discovery material and following up on leads. Multiple witnesses testified that Eppolito's counsel, Bruce Cutler, personally analyzed hundreds of hours of audio recorded by key government witness Steven Corso. Investigator Jack Ryan--called by Eppolito to testify on his behalf at the hearing-- stated that Cutler was open and approachable regarding investigative leads. . . .

> Eppolito maintains that his trial counsel was ineffective because he refused to call witnesses that

- 28 -

Eppolito thought could assist him, including Lizzie Hydell, the sister of murder victim James Hydell; Al Guaneri, Eppolito's brother-in-law and fellow retired New York City police detective; and Anthony Casso, the defendants' prevaricating co-conspirator. Cutler's choice not to call these witnesses, however misunderstood by his client, was not only a reasonable strategic decision, but an eminently wise one. As Cutler explained, the value of Guaneri's testimony was debatable and Guaneri indicated that he had mixed feelings about Eppolito and was reluctant to testify. Lizzie Hydell was understandably hostile to Eppolito, casting doubt on the value of any testimony she might have been able to give on his behalf. Calling Casso would have been an unmitigated disaster; up until the final days of the trial, Casso had done nothing but implicate the defendants, even making eleventh-hour attempts to assist the government.

Given the strong evidence presented by the government, the primary strategy left to defense counsel was, as Cutler testified, to "pulverize" the government's witnesses on cross-examination, which Cutler and Hayes both attempted with gusto. Cutler repeatedly and strenuously challenged the credibility of the witnesses, pointing out their motives to lie and the inconsistencies and weaknesses in their testimony. That his attempts to shake these witnesses was ultimately unsuccessful is not an indication of any failing on Cutler's part, but rather resulted from the overwhelming strength of the government's case and its witnesses.

. . . .

Hayes' co-counsel, Rae Koshetz, argued the statute of limitations issue at length and in detail. Although Koshetz's argument was ostensibly made solely on behalf of Caracappa, it should, for the purposes of determining prejudice, be deemed to have been made for both defendants, since the argument applied equally to both. Thus, even if it was error for Cutler not to have raised the statute of limitations argument in his own summation, Eppolito could not have been prejudiced by this failure on the part of his counsel.

The court has considered the additional allegations of error relied upon by the defendants and concludes that none of these contentions supports the conclusion that the defendants were denied the

- 29 -

effective assistance of counsel guaranteed by the Constitution. While there may be disagreement as to the value of the sometimes baroque style of these two attorneys, they were clearly skilled, dedicated to their clients, and enormously hardworking. Monday-morning quarterbacking is not a sport encouraged by the laws governing ineffective assistance claims. Strickland, 466 U.S. at 689, 104 S.Ct. 2052 ("there are countless ways to provide effective assistance in any given case" and "even the best criminal defense attorneys would not defend a particular client in the same way").

Eppolito I, 436 F.Supp.2d at 563-64. We see no error in this ruling.

Finally, with respect to the contention that Cutler failed to advise Eppolito that he had the right to testify at trial, the district court observed that

[a] defendant's right to testify in his own defense is personal and may not be waived by his attorney over the defendant's opposition. Brown v. Artuz, 124 F.3d 73 (2d Cir.1997); Campos v. United States, 930 F.Supp. 787, 789 (S.D.N.Y.1996). Trial counsel's duty of effective assistance includes the responsibility to advise the defendant concerning the exercise of this constitutional right. Brown, 124 F.3d at 79.

"[A]ny claim by [a] defendant that defense counsel has not discharged this responsibility-- either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify--must satisfy the two-prong test established in Strickland v. Washington for assessing whether counsel has rendered constitutionally ineffective assistance": objectively unreasonable performance and prejudice. Id. (internal citations omitted).

Eppolito I, 436 F.Supp.2d at 562. The district court rejected Eppolito's right-to-testify-based ineffective assistance claim for failure to meet the prejudice prong:

At the June 23, 2006 evidentiary hearing, Eppolito testified that his trial counsel, Bruce

- 30 -

Cutler, had not informed him that he had a constitutional right to testify and had repeatedly refused his requests to take the stand, telling him that he would never take the stand so long as Cutler was his attorney. Eppolito also asserted that, despite his over twenty years of work in law enforcement, he was unaware of his right to testify. Although both Cutler and his co-counsel, Bettina Schein, conceded that neither of them had specifically informed Eppolito that he had a constitutional right to testify, both refuted Eppolito's claim that he had repeatedly insisted that he should testify. Cutler and Schein testified that they had each discussed the issue of Eppolito testifying with him once before the trial, advising him that his testimony would do little to help and much to hurt him, given the court's exclusion of bad acts evidence the government wanted to introduce. Schein also testified that her discussion with Eppolito led her to believe that Eppolito was well aware of his right to testify if he chose to do so over counsel's advice.

Because Eppolito's testimony at the hearing made it clear that he was not a credible witness--he admitted to being an inveterate liar, repeatedly contradicted his own prior recorded statements and written accounts, and gave inconsistent answers to the same questions at different times during his testimony--the court does not credit his assertions regarding his lack of knowledge of his right to testify and Cutler's refusal to allow him to testify.

As for Cutler's failure to inform Eppolito of his right, the law is unclear regarding whether he was required to give Eppolito a prophylactic, Miranda-like warning or merely to determine that Eppolito was aware of, and could make an intelligent decision regarding, his right to testify. Compare Brown, 124 F.3d at 79 ("counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant") with DeLuca v. Lord, 858 F.Supp. 1330, 1358 (S.D.N.Y.1994) ("There is no blanket requirement that counsel must explicitly warn all of their clients that they have the ultimate right to decide whether or not to testify."). Cutler admitted that he did not, in so many words, tell Eppolito that he had an absolute right to testify, but both he and Schein discussed the issue of testifying with Eppolito, and Schein believed Eppolito knew of his right.

- 31 -

Regardless of the relevant standard--and regardless of whether Cutler did or did not fulfill it--Eppolito's claim must fail. Even if Cutler was required to explicitly inform Eppolito of his right to testify, Eppolito did not establish that the outcome of the trial could have been different had he testified. Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (even if counsel's performance was objectively unreasonable, defendant must show that there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different"). On the contrary, Eppolito's testimony at the hearing made it overwhelmingly clear that his testimony at the trial would have proven a disaster to himself and his co-defendant.

In addition to describing himself, under oath, as a man who would lie in order to get what he wanted, Eppolito gave numerous examples of times when he had lied or embellished in order to further his career or his image. He discussed his own racism at great length, volunteering a long list of racial slurs that he said he often used; admitted to having placed a sawed-off shotgun in the mouth of a man who had insulted his mother, expressing disbelief when the prosecutor asked him whether he knew that such an act was illegal; and confessed to having removed files from the police department without permission. On cross-examination, he repeatedly volunteered more self-damaging information than was necessary to answer the prosecution's questions. As for his testimony regarding the crimes with which he was charged, it appears that, aside from a general denial of involvement, Eppolito had little to say. Although Eppolito claimed that he had told his counsel that he could refute the charges against him, his testimony at the hearing gave no indication that this was the case. His testimony about the critical issue of his association with Burton Kaplan--namely, that he knew Kaplan as a merchant of clothing--would not have added anything that had not been brought out on his counsel's cross-examination of Kaplan.

Eppolito I, 436 F.Supp.2d at 564-65 (emphasis added).

Given the district court's superior ability to make credibility assessments based on its first-hand observation of the witnesses at the evidentiary hearing, we defer to those

assessments, and we see no error in the court's factual findings. We reject Eppolito's claim that he was denied effective assistance because of counsel's failure to advise him of his right to testify substantially for the reasons stated by the district court.

## CONCLUSION

We have considered all of the contentions of Caracappa and Eppolito on these appeals and have found them to be without merit. The judgments of the district court are affirmed.